PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TERRY ALVIN HYATT,

     *Petitioner-Appellant,*

v.

GERALD BRANKER, Warden, Central
Prison, Raleigh, North Carolina,

     *Respondent-Appellee.*

No. 08-15

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(1:05-cv-00055-LHT)

Argued: May 14, 2009

Decided: June 23, 2009

Before NIEMEYER, MOTZ, and TRAXLER,
Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Traxler joined.

## COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant. Valerie Blanche Spalding, NORTH CAROLINA

DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Faith S. Bushnaq, BUSHNAQ LAW OFFICE, PLLC, Charlotte, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After a North Carolina jury convicted Terry Alvin Hyatt of two counts each of murder, rape, kidnapping, and robbery, a state court sentenced him to death. Hyatt now appeals the district court's denial of his petition for federal habeas relief. Hyatt obtained a certificate of appealability as to whether the state court violated his (1) Fifth and Fourteenth Amendment rights in refusing to suppress incriminating statements made by Hyatt without the benefit of counsel, (2) his Sixth Amendment rights by denying his request to discharge his court-appointed attorneys after the trial began, and (3) his Fourteenth Amendment due process rights by failing to instruct the jury on a lesser-included offense. For the reasons that follow, we affirm the district court's denial of habeas relief.

I.

We begin with a summary of the facts—first those relating to Hyatt's crimes and subsequent trial in state court and then those relating to Hyatt's post-conviction proceedings.

A.

On direct review of Hyatt's conviction, the Supreme Court of North Carolina fully set forth the facts relating to Hyatt's crimes. *See State v. Hyatt*, 566 S.E.2d 61, 65–67 (N.C. 2002). We briefly summarize those facts here and later set forth addi-

tional facts as necessary to understand each of Hyatt's particular claims.

On August 13, 1998, while intoxicated, Jerry Harmon visited the sheriff's department in Buncombe County, North Carolina. He provided officers with information relating to the murder of Betty Sue McConnell, which had occurred two decades earlier, in August 1979. Harmon stated that he and Terry Hyatt abducted Ms. McConnell and that Hyatt then raped and murdered her. Harmon also suggested that Lester Dean Helms might have additional information about Hyatt. In October 1998, law enforcement officers interviewed Helms, who told them that Hyatt kidnapped and murdered another woman—Harriet Delaney Simmons—in April 1979.

Law enforcement officers then questioned Hyatt with respect to these crimes. After Hyatt made incriminating statements, the officers arrested him. A grand jury in Buncombe County, North Carolina, subsequently indicted Hyatt for the first-degree kidnapping, robbery with a dangerous weapon, first-degree rape, and first-degree murder of both Ms. Simmons and Ms. McConnell.

At trial, the State offered evidence that just after midnight on April 14, 1979, Ms. Simmons left Raleigh, North Carolina, and began driving to Nashville, Tennessee. Helms and Hyatt encountered Ms. Simmons at a rest stop where she was having car trouble. Ms. Simmons entered their van after they offered to help. Helms and Hyatt then drove to a secluded, wooded area, and Hyatt raped Ms. Simmons in the back of the van. Hyatt, who was carrying a knife at the time, then took Ms. Simmons into the woods. Helms heard Ms. Simmons scream. Hyatt returned to the van alone with blood on his shirt. A year later, the sheriff's department located Ms. Simmons's remains and personal effects. An autopsy revealed that Ms. Simmons died from multiple stab wounds to her chest.

Regarding the murder of Ms. McConnell, the State offered evidence that, on August 24, 1979, Jerry Harmon and Terry Hyatt spent the day together. While drinking and driving around, they encountered Ms. McConnell. Hyatt drove his truck into Ms. McConnell's car, pushing it off the road. He then forced Ms. McConnell into the passenger seat of her car and drove her to an isolated, wooded area near a river. Harmon followed behind them, and he watched as Hyatt raped Ms. McConnell. Hyatt, again armed with a knife, took Ms. McConnell down to the river, out of Harmon's sight. Harmon heard Ms. McConnell scream. Upon his return, Hyatt told Harmon that he had stabbed Ms. McConnell and thrown her into the river. Hyatt then drove Ms. McConnell's car into the river some distance away. The next morning, a nearby resident discovered Ms. McConnell on his driveway. Ms. McConnell was soaking wet, and her chest was covered with blood. Prior to dying from the stab wounds to her chest, Ms. McConnell stated that she "was picked up at work by two guys" and then "stabbed and thrown into the river."

The jury convicted Hyatt on all counts and then recommended sentences of death for both murder convictions. The trial court entered two capital sentences and six consecutive sentences of life imprisonment for the noncapital offenses.

The Supreme Court of North Carolina affirmed on direct appeal, *Hyatt*, 566 S.E.2d at 80, and the United States Supreme Court denied certiorari, *Hyatt v. North Carolina*, 537 U.S. 1133 (2003).

### B.

On October 31, 2003, Hyatt filed his first post-conviction motion for appropriate relief in the Superior Court of Buncombe County. He amended the motion on December 23, 2003. The state trial court denied relief on January 23, 2004, and the Supreme Court of North Carolina denied certiorari.

Hyatt filed a second post-conviction motion for appropriate relief in state court on April 15, 2005. The court denied Hyatt relief, and the state supreme court again denied certiorari.

On December 10, 2007, Hyatt filed this federal habeas petition in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. § 2254 (2006). The district court denied relief but granted a certificate of appealability on numerous issues, only two of which Hyatt pursues before us, namely whether the state court denied Hyatt counsel of his choice and whether that court erred in failing to suppress certain incriminating statements that Hyatt had made during his initial interrogation.

Hyatt noted a timely appeal. We granted a certificate of appealability on one additional claim: whether the state court committed constitutional error in refusing to instruct the jury as to lesser-included offenses.

## II.

We review the district court's denial of a habeas petition *de novo*. *Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), however, limits the scope of our review of state convictions. *See Williams v. Taylor*, 529 U.S. 362, 402–13 (2000). If the state court adjudicated a claim on its merits, a federal court may only grant habeas relief if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2006); *see also Larry v. Branker*, 552 F.3d 356, 365 (4th Cir. 2009). "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"

*Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (*quoting* 28 U.S.C. § 2254(e)(1) (2006)).

With this standard governing our review, we turn to Hyatt's contentions.

### III.

Initially, Hyatt argues that North Carolina law enforcement officers violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981), by denying him assistance of counsel during a custodial interrogation and by deceiving him during the course of the interrogation. He further contends that the state court violated clearly established federal law by failing to suppress the incriminating statements he made when interrogated in this assertedly unconstitutional manner.

### A.

Hyatt's argument rests on the facts surrounding his initial interrogation by law enforcement officers. On November 19, 1998, Tim Shook, a special agent with the North Carolina State Bureau of Investigation, and Anne Benjamin, a detective with the Buncombe County Sheriff's Department, visited Hyatt at his home. They told Hyatt that they were investigating a murder that had occurred earlier in that year; Hyatt then offered to provide a DNA sample to clear his name. Hyatt voluntarily drove his truck to the Buncombe County Public Health Department for a blood draw.

After Hyatt gave the blood sample, he and the officers drove to the Buncombe County sheriff's office. Upon arrival at the interview room, Agent Shook explained that the officers were actually investigating the abduction, rape, and murder of Betty Sue McConnell. The officers told Hyatt (falsely) that they possessed fingerprint evidence connecting him to the scene of the crime. Hyatt's demeanor changed, and he became

silent. Agent Shook read Hyatt his *Miranda* rights, and Hyatt signed an acknowledgement to this effect. Hyatt agreed to speak with the officers, but he asked to speak with his father first.

The officers handcuffed Hyatt, and Agent Shook, Detective Benjamin, and Pat Hefner, the captain of the Buncombe County Sheriff's Department, drove him to his father's house. He remained handcuffed throughout the visit. Hyatt and his father first spoke on the back porch. Hyatt told his father that he was in trouble for something that had occurred a long time ago. According to Hyatt's father, Hyatt stated, "I want you to get me a lawyer." Although Hyatt and his father whispered, Hyatt's father testified that Agent Shook, who stood ten or twelve feet away, was close enough to hear their conversation, including Hyatt's request for a lawyer. Agent Shook acknowledged that he "could hear most everything" but unequivocally testified that he did not hear Hyatt ask for counsel. Agent Shook did, however, recall that Hyatt's *father instructed* Hyatt to retain a lawyer. Detective Benjamin stood farther away, approximately twenty feet, and testified that she heard very little of the discussion. Captain Hefner remained in the front yard.

Hyatt and his father then walked to the front porch, where Hyatt's girlfriend, Cindy Spalding, awaited. Agent Shook and Detective Benjamin followed Hyatt around to the front. Spalding testified that at that time Hyatt asked his father to find him an attorney. Agent Shook again testified that he did not hear Hyatt request counsel. Once again, Detective Benjamin and Captain Hefner stood too far away to hear their conversation.

Hyatt and the officers returned to the sheriff's department. Hyatt remained in handcuffs during the trip. Once in the interrogation room, Hyatt stated that his "daddy wanted him to call a lawyer." Detective Benjamin, however, told Hyatt that he was 41 years old and that he needed to decide for himself

whether he wanted the assistance of counsel. Agent Shook and Detective Benjamin both testified that Hyatt never expressly asked for an attorney.

During the interrogation that followed, Hyatt made a series of incriminating statements. He stated that he was guilty of robbing someone but denied killing anyone. He nonetheless asked what would happen to him if he did admit to killing Ms. McConnell. He then acknowledged that he was present when Ms. McConnell was murdered but contended that Harmon raped and killed her. After Agent Shook asked him about the murder of Ms. Simmons, Hyatt terminated the interview. The officers then formally arrested Hyatt.

Meanwhile, after Hyatt left his father's house, Hyatt's brother telephoned Hyatt's father, who explained that "[the police] have just taken your brother out of here in handcuffs for murder." The brother then called a local attorney, Sean Devereux, and asked him to represent Hyatt. Both Hyatt's father and his brother told Devereux that Hyatt had requested the assistance of an attorney. Devereux called the sheriff's department, stated that he represented Hyatt, and asked the officers to cease the interrogation. But the officers at the sheriff's department refused, stating that Hyatt had not invoked his right to counsel.

Devereux drove to the sheriff's office, again explained that he represented Hyatt, and attempted to speak with him. But the law enforcement officers and assistant district attorneys refused Devereux's request. During the interrogation, the officers did not inform Hyatt that Devereux had arrived at the sheriff's office and claimed to represent him. Only after Hyatt terminated the interrogation did the officers permit Devereux to see him. Devereux then witnessed a conversation in which Hyatt reportedly asked Detective Benjamin, "Why did you lie to me about a lawyer? You know that I asked for a lawyer." Detective Benjamin replied, "No, you didn't, Terry. You

asked to speak to your father, but you never asked for a lawyer."

### B.

Prior to trial, Hyatt moved to suppress the incriminating statements set forth above on the ground that the law enforcement officers denied his request for assistance of counsel. The state trial court held a suppression hearing, during which Agent Shook, Detective Benjamin, Sean Devereux, Hyatt's father, Hyatt's brother, and Cindy Spalding testified.

After listening to their testimony and considering legal arguments, the state trial court denied Hyatt's motion to suppress. In so doing, the court made a series of factual findings:

> [Hyatt] talked to his father on the porch of the residence where his father was, and [Agent] Shook was close enough to hear what—some of what he was saying, that is, [Hyatt] said he was in trouble from something a long time ago and that he was going to have to go back to the Sheriff's Department with the officers. And at that time, there was some discussion between the Defendant and his father, wherein the Defendant said to get him a lawyer, a hired lawyer, meaning a private attorney.
>
> And then he, the Defendant, told the officers that his father wanted him to get an attorney. That this statement was repeated at that place.
>
> . . . .
>
> [At the sheriff's department, Hyatt] did not ask for a lawyer but rather repeated the statement that his father wanted him to have a lawyer.

Thus, with respect to the conversation with his father, the court found that Hyatt *did* ask his father "to get him a lawyer"

and that Agent Shook overheard *parts* of the conversation between father and son. But the court's findings are ambiguous as to whether Shook actually heard Hyatt request an attorney. As to the conversation at the sheriff's office, the court found that Hyatt did not invoke his right to counsel, "but rather repeated the statement that his father wanted him to have a lawyer."

The trial court did not rest its denial of Hyatt's suppression motion on any finding as to whether a law enforcement officer heard Hyatt's request for counsel. Rather, the trial court held that "up until [Hyatt] was formally arrested" at the conclusion of the interrogation, "he was not in custody." Thus, the trial court found that Hyatt's *Miranda* and *Edwards* rights did not attach until the officers "formally arrested" him. The court further concluded that Hyatt voluntarily waived any rights he did possess.

On direct appeal, the Supreme Court of North Carolina affirmed but on alternative grounds. The court assumed that Hyatt was in custody during the interrogation but found no error in admitting Hyatt's incriminating statements because he had not invoked his right to counsel. *Hyatt*, 566 S.E.2d at 69-71. The state supreme court found that (1) "neither Agent Shook nor Detective Benjamin heard [Hyatt's] alleged invocation of his right to counsel" while at his father's house, *id.* at 71, (2) Hyatt's statement that his "daddy wanted him to call a lawyer" did not "constitute an unambiguous request for counsel," *id.*, and (3) because law enforcement officers need not "inform a suspect of his lawyer's efforts to contact him," *id.* at 72, the officers did not violate Hyatt's right to counsel by refusing to permit Devereux to meet with Hyatt during the interrogation or by failing to inform Hyatt that Devereux had arrived at the sheriff's office.

### C.

During the course of a custodial interrogation, "if a suspect requests counsel at any time during the interview, he is not

subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994) (*citing Edwards*, 451 U.S. at 484-85). Whether a suspect has invoked counsel is "an objective inquiry." *Id.* at 459. "It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459. Rather, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

1.

We first address Hyatt's argument that he requested counsel during his conversations with his father. To invoke a right to counsel, the suspect himself must request an attorney and a representative of the state must hear that request. *See id.* at 458-59. Thus, this claim turns on a single question of fact hotly disputed by the parties: whether a law enforcement officer *heard* Hyatt make an unequivocal request for counsel. As noted above, under AEDPA, we must "presume the correctness of state courts' factual findings unless applicants rebut this presumption with clear and convincing evidence," *Schriro*, 550 U.S. at 473-74 (quotation omitted).

Here, Agent Shook and Detective Benjamin testified that neither ever heard Hyatt request counsel. Hyatt's father testified to the contrary. The state supreme court credited the testimony of Agent Shook and Detective Benjamin over that of Hyatt's father. *Hyatt*, 566 S.E.2d at 71. Although Hyatt challenges this finding, he fails to show that the state court's deci-

sion was "unreasonable" based on the evidence available, and he offers no "clear and convincing evidence" that the state court erred.[1] Accordingly, we must defer to the state court's finding that law enforcement officers did not hear Hyatt request counsel while at his father's house. Given this finding, the state court did not err in holding that Hyatt did not then invoke his right to counsel.

2.

Next, Hyatt maintains that his statement during the interrogation at the sheriff's office—that his "daddy wanted him to call a lawyer"—sufficed to invoke counsel and that the Supreme Court of North Carolina erred in finding to the contrary. We disagree. Federal law requires a suspect to make an *unequivocal* request for counsel. *Davis*, 512 U.S. at 461–62. The state court's holding—that Hyatt's statement at the sheriff's office did not unequivocally express a desire for an attorney—does not constitute an unreasonable application of federal law.

3.

Finally, Hyatt claims that law enforcement officers deceived him by failing to inform him of Devereux's presence at the sheriff's office during the interrogation and that this deceit constitutes a constitutional violation. The Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412 (1986), compels us to reject this argument.

---

[1]The state supreme court initially noted in passing that "[t]he state's evidence was uncontroverted . . . that neither Agent Shook nor Detective Benjamin heard [Hyatt] request an attorney while at his father's residence." *Hyatt*, 566 S.E.2d at 68. Hyatt points out that his father testified that Agent Shook stood near enough to hear Hyatt's request for counsel. The state supreme court, however, later specifically addressed the testimony of Hyatt's father, but credited Agent Shook's sworn testimony that he did not hear Hyatt request counsel. *Id.* at 70–71.

In *Moran*, as here, police failed to inform a suspect that his lawyer had attempted to contact him. *Id.* at 417-18. The Supreme Court held that this event, "outside of the presence of the suspect and entirely unknown to him . . . ha[d] no bearing on the [suspect's] capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Court recognized that this information "would have been useful" to the suspect and that "it might have affected his decision to confess." *Id.* But the Court found that law enforcement officers need not "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.*

In the case at hand, the state court found that the law enforcement officers had no constitutional obligation to inform Hyatt of Devereux's presence at the sheriff's department. Hyatt notes that *Moran* contains dicta suggesting that "egregious . . . police deception might rise to a level of a due process violation." *Id.* at 432. But the Supreme Court has not yet found such "egregious" conduct to exist in any case and has not otherwise provided standards to determine what constitutes such "egregious" conduct. Hyatt, therefore, can present no authority to demonstrate that the officer's conduct here was "egregious" under *clearly established* Supreme Court precedent.[2]

In sum, Hyatt provides no basis for us to disturb the state court's holding that Hyatt waived his right to counsel during a custodial interrogation in "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.

---

[2]Moreover, Hyatt fails to cite Supreme Court precedent showing that the officers' use of ruses—first misleading Hyatt about the subject of their investigation and then falsely asserting the existence of fingerprint evidence—violated his constitutional rights.

## IV.

Hyatt next maintains that the state court violated his Sixth Amendment right to trial counsel of his choice by denying his motion to dismiss his court-appointed attorneys.

### A.

On the fifth day of trial, Friday, January 14, Hyatt interrupted jury selection and asked the court to dismiss his appointed attorneys. He argued that his attorneys had a conflict of interest, evidenced by their failure to obtain certain medical records. The court allowed a brief recess during which Hyatt obtained counsel—again Sean Devereux—to argue this motion. Appearing for this limited purpose, Devereux asked the court to adjourn determination of Hyatt's oral motion until the next day of court, Tuesday, January 18, 2000. The court agreed to do so.

On that Tuesday, Devereux filed a written motion on Hyatt's behalf, asking the court to discharge appointed counsel and substitute retained counsel. Devereux explained that attorneys Tony Lynch and David Belser were "prepared to step in" and that Hyatt's family could retain them "immediately." Lynch and Belser were not, however, present in the courtroom, and Hyatt admits that he had not yet actually retained them. Nonetheless, Hyatt swore in an affidavit and his attorney represented orally in open court that Hyatt was in a position to retain them if permitted to do so by the trial court. Hyatt also claimed that communication with his court-appointed lawyers had "broken down."

In support of Hyatt's motion, Devereux argued that "the Sixth Amendment right to counsel extends to counsel of one's own choosing." But he also noted that "[c]learly the disposition of this motion is within the court's discretion. There are countervailing concerns. . . . There are a number of cases that

have upheld the court's denial either of change of counsel or continuance under similar circumstances."

Although the State argued that Hyatt had not shown his appointed counsel to be ineffective, it did not oppose substitution of counsel. The State did, however, object to any continuance of the trial. The trial court then asked whether Hyatt would request a continuance, and Devereux stated that "I think that motion will probably be made by counsel in this case. As your Honor knows, I've limited my appearance to arguing this motion. I don't want to make that decision for anyone else."

B.

The trial court then denied Hyatt's motion to substitute counsel. First, the court found that "implicit in [Hyatt's motion] is a prospective motion to continue the case." And the court decided that it would not delay or continue the trial to allow Hyatt to change counsel. Second, the court determined that Hyatt had not shown his appointed counsel ineffective and that the court had cured the cause for Hyatt's displeasure with appointed counsel by issuing a subpoena for the medical records. The court noted that Hyatt had offered nothing "substantively or inferentially" to show that his conflict with his appointed counsel was "so great as to result in any lack or total lack of communication between counsel and client so as to prevent an adequate defense." Finally, the trial court stated that Hyatt could, if he wished to do so, hire additional attorneys to assist his court-appointed counsel.

On direct appeal, the Supreme Court of North Carolina first noted that Hyatt did not "allege ineffective assistance of counsel." *Hyatt*, 566 S.E.2d at 77. Then, quoting the trial court's finding that Hyatt's motion to substitute counsel contained an "implicit . . . prospective motion to continue," the state supreme court rejected Hyatt's Sixth Amendment claim. *Id.* at 77-78. The court reasoned that a trial court may reject "a

defendant's request to substitute retained counsel where he or she offered no justifiable basis for the replacement and where doing so would obstruct the orderly procedure of trial." *Id.* at 78.

### C.

In *United States v. Gonzalez-Lopez*, the Supreme Court held that the Sixth Amendment provides a criminal defendant the right to "the counsel he believes to be best." 548 U.S. 140, 146 (2006).[3] The court rejected the contention that, to show a constitutional violation from a denial of substitution of counsel, a criminal defendant must demonstrate that the original counsel "was ineffective within the meaning of *Strickland v. Washington*." *Id.* at 144-48. Rather, because "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants," "[w]here the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.* at 148. Indeed, "deprivation of the right to counsel of choice . . . unquestionably qualifies as structural error." *Id.* at 150 (citation omitted).

The Supreme Court clearly explained in *Gonzalez-Lopez*, however, that the right to choose counsel is not without limit. Particularly relevant here, a trial court maintains "wide latitude in balancing the right to counsel of choice against the

---

[3]The Supreme Court issued its opinion in *Gonzalez-Lopez* four years after the Supreme Court of North Carolina ruled on Hyatt's direct appeal. Nonetheless, citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25 (1989), and similar cases, Hyatt maintains that *Gonzalez-Lopez* merely stated a rule dictated by precedent, and thus that rule may form a basis for AEDPA relief. Because Hyatt's challenge fails even under *Gonzalez-Lopez*, we need not parse precisely what federal law was "clearly established" on this point at the time of the Supreme Court of North Carolina's ruling.

needs of fairness, and against the demands of its calendar." *Id.* at 152 (citations omitted).

Recognizing that a trial court may deny a motion to substitute counsel to preclude delay of an ongoing trial, Hyatt rests his argument on the contention that, in his case, the trial court wrongly concluded that his motion to substitute counsel would require a continuance. Hyatt directs us to portions of the trial transcript where his counsel stated that substitute counsel was immediately available, and he provides affidavits asserting the same.[4] But this evidence is insufficient to overcome the trial court's finding that a motion to continue was "implicit" in Hyatt's motion to change attorneys.

Hyatt's own attorney admitted that new counsel would "probably" file a motion to continue. The trial court certainly could rely on this assertion. Moreover, in exercising its "wide latitude," the trial court properly drew on its experience in determining whether a motion to change counsel in the midst of a capital case involving two victims, two murder charges, and two different accomplices would require a delay of the

---

[4]The parties dispute at length whether a federal court on habeas review may consider these affidavits—one by Devereux and one by Belser. The State contends that no state court considered them on the merits, and thus we may not consider them on federal habeas; Hyatt disagrees. We need not resolve this dispute, however, because the affidavits have no bearing on the issue before us. In his affidavit, Devereux states that alternative counsel could have "immediately assume[d] representation of Terry Hyatt," even without a continuance. Belser similarly asserts that, although "not completely comfortable with taking over a capital trial that had already begun," he was willing to represent Hyatt if the court granted Hyatt's motion to discharge appointed counsel and Hyatt secured adequate funds. Whether new counsel would have immediately "undertaken" Hyatt's representation is beside the point. Rather, the issue before us is whether the trial court reasonably determined—based on the nature of the case before it and the representations of the parties—that a motion to substitute counsel would likely require a continuance after new counsel had "undertaken" the representation. The Devereux and Belser affidavits do not address this issue.

trial. Given these facts, the trial court could reasonably believe that, in order to be effective, any new attorney would require a continuance *after* undertaking the defense. In such a complicated and weighty case, new counsel would undoubtedly need time to study the state's allegations and evidence, the procedural history of the case, and—in consultation with the accused—formulate a defense strategy.

Accordingly, we have no basis to disturb the state court's finding that Hyatt's motion to substitute counsel contained an "implicit" motion to continue. Because the state court reasonably believed that granting Hyatt's motion would necessitate delay, the court acted within its discretion in rejecting the request.[5] That decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## V.

Finally, Hyatt argues that the trial court erred in denying his request for a jury instruction on the lesser-included offense of second-degree murder. On appeal, the Supreme Court of North Carolina affirmed, finding that "there was no evidence upon which the jury could find [Hyatt] guilty of second-degree murder" because Hyatt "did not negate any of the elements of first-degree murder." *Hyatt*, 566 S.E.2d at 73.

## A.

In challenging this holding, Hyatt relies heavily on *Beck v. Alabama*, 447 U.S. 625 (1980). There the Supreme Court held

---

[5]Hyatt makes much of the fact that the trial court denied his motion not only because of its finding with respect to delay, but also because Hyatt had not shown that his court-appointed attorneys were ineffective. It is true that the state court rejected Hyatt's claim on multiple grounds. But its finding with respect to delay provides an appropriate and sufficient basis for its ruling.

that capital defendants have a constitutional right to receive a jury instruction on a lesser-included offense "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense." *Id.* at 637. The Court found that the failure to give the jury a "third option" other than conviction on a capital charge or outright acquittal "would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* The Supreme Court later cautioned, however, that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

A *Beck* challenge does not question whether the prosecutor presented evidence sufficient to sustain a conviction of a capital offense. *See Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) ("A *Beck* claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction . . . ."). Rather, *Beck* requires a lesser-included offense instruction when the evidence at trial merely casts "some doubt" on a *necessary element* of the capital charge. *Beck*, 447 U.S. at 637; *see also Larry*, 552 F.3d at 364.

North Carolina defines first-degree murder as the "unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 405 S.E.2d 145, 154 (N.C. 1991); *see also* N.C. Gen. Stat. § 14-17 (2007). The state defines second-degree murder as the "unlawful killing of a human being with malice but *without premeditation and deliberation*." *State v. Thibodeaux*, 532 S.E.2d 797, 806 (N.C. 2000) (quotation omitted; emphasis added). Thus, to have a constitutional entitlement to a jury instruction for second-degree murder under *Beck*, Hyatt must show that evidence presented to the jury creates some doubt with respect to either premeditation or deliberation. *See Larry*, 552 F.3d at 366-67.

In North Carolina, "[p]remeditation means that the act was thought over beforehand for some length of time, however

short." *State v. Taylor*, 669 S.E.2d 239, 256 (N.C. 2008) (quotation omitted). And "[d]eliberation means an intent to kill, carried out in a cool state of blood, . . . and not under the influence of a violent passion or a sufficient legal provocation." *Id.* (quotation omitted).

## B.

Hyatt maintains that, for several reasons, the state trial court erred in failing to instruct the jury on second-degree murder.

First, Hyatt argues that the two principal witnesses against him—Helms and Harmon—were unbelievable, and so the jury could have doubted the reliability of their testimony that Hyatt committed the murders. Hyatt presents an affidavit from Harmon's ex-wife in which she states that, after the trial, Harmon told her that "he was so drunk and drugged up that he may have raped [the victim] and killed her himself but he just didn't remember." This argument misses the mark. The evidence on which Hyatt relies may create some doubt as to the *identity* of the murderer, but it does not speak to whether the murderer of Ms. McConnell or Ms. Simmons acted with premeditation or deliberation. That is, the evidence may have diminished the strength of the State's first-degree murder case against Hyatt, but it did not suggest that Hyatt was guilty of second-degree murder in lieu of the capital offense. Thus, this provides no basis for a *Beck* claim.

Second, Hyatt maintains that the *absence* of certain kinds of evidence in the State's case establishes his entitlement to a *Beck* claim. He asserts that the State presented no evidence that he had previously known the victims, that he planned the crimes or otherwise prepared to kill the victims, or that he attempted to conceal the crimes. To be sure, these all constitute ways in which the State *could* have proven premeditation and deliberation. *See State v. Fisher*, 350 S.E.2d 334, 337–38 (N.C. 1986). But, if we accepted Hyatt's argument, a capital

defendant would be entitled to a lesser-included jury instruction *whenever* the state fails to introduce evidence as to every possible means of proving premeditation or deliberation. In *Hopper*, however, the Supreme Court made clear that a capital defendant is entitled to a *Beck* instruction only when evidence warrants such an instruction. 456 U.S. at 611. Hyatt's argument here fails to present *any evidence* casting some doubt as to premeditation and deliberation.

Finally, Hyatt directs us to Harmon's trial testimony. Harmon testified that prior to killing Ms. McConnell, Hyatt told her, "We're not going to hurt you. We're just going to f— you, and then I'm going to let you go." Hyatt claims that this evidence suffices under *Beck* to warrant a second-degree murder jury instruction with respect to the murder of Ms. McConnell. But this lone statement, in and of itself, casts no doubt on premeditation or deliberation. Hyatt carried a knife while making this statement. He also apparently raped Ms. McConnell after making the statement and then murdered her sometime after the rape, providing sufficient time to premeditate and deliberate. Under these circumstances, we find that the state court did not unreasonably apply federal law in finding that the statement did not raise "some doubt" as to whether Hyatt premeditated or deliberated.

## VI.

For these reasons, the judgment of the district court is

*AFFIRMED*.