GREGORY, Circuit Judge,
concurring in part and dissenting in part.
Today’s decision overlooks the prejudice that Leon Jermain Winston suffered from the utter failure of counsel to investigate and present mitigating evidence at the penalty phase where he received a capital sentence. If we are to safeguard the Sixth Amendment right to effective assistance of counsel in criminal cases, then we must conduct a meaningful review of the record when, as here, there is a vast quantity of unquestionably mitigating evidence that was never presented to the jury. Moreover, while it appears that Winston failed to raise the issue in his state habeas petition, I disagree with the majority’s merits-inquiry denying Winston’s claim that his due process rights were violated by the state court’s refusal to instruct the jury on lesser included homicide charges. The majority misinterprets the evidence at trial by equating evidence placing Winston at the scene with evidence that Winston was the triggerman. Only the latter satisfies Virginia’s requirement for a capital conviction. Therefore, I respectfully dissent from the portions of this opinion denying those two claims, but I concur in the majority’s judgment as to the remaining issues.
I.
In section II.B, the majority concludes that Winston’s due process rights were not violated when the state court denied his request for instructions on lesser included homicide charges. I agree that Winston did not raise this issue in his state habeas petition. Because the majority proceeds to reach the merits and because the Commonwealth did not raise the issue of exhaustion in the district court or before this Court, I note my disagreement with the majority’s assessment.
The merits inquiry is guided by the Supreme Court’s decision in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In Beck, the Court announced the principle that
capital defendants have a constitutional right to receive a jury instruction on a lesser-included offense “when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense.”
Hyatt v. Branker, 569 F.3d 162, 174 (4th Cir.2009) (quoting Beck, 447 U.S. at 637, 100 S.Ct. 2382); Bates v. Lee, 308 F.3d 411, 420 (4th Cir.2002). The Court concluded that finding otherwise would “enhance the risk of an unwarranted conviction.” Beck, 447 U.S. at 637, 100 S.Ct. 2382.
The Supreme Court subsequently explained that “due process requires that a lesser included offense instruction be given only when the evidence warrants” it. Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). I agree with the majority that Virginia’s rule poses no constitutional problem because it is consistent with the federal rule and that the application of the two rules is identical. What the majority fails to appreciate is that this Court has found that whether the *562 evidence warrants the instruction is not a sufficiency of the evidence question. See Hyatt, 569 F.3d at 174. Instead, “Beck requires a lesser-included offense instruction when the evidence at trial merely casts ‘some doubt’ on a necessary element of the capital charge.” Id.; cf. Taylor v. Workman, 554 F.3d 879, 887 (10th Cir. 2009) (finding that Beck clearly holds that courts are not to determine which instruction they feel is most warranted but instead must give the lesser included offense instruction in every case where the evidence supports it).
Under Virginia law, the “element that would justify conviction of a capital offense,” Beck, 447 U.S. at 637, 100 S.Ct. 2382, in this case is that Winston is a principal in the first degree. Frye v. Commonwealth, 231 Va. 370, 345 S.E.2d 267, 280 (1986). Winston argues that because there was evidence that he was not the triggerman, and therefore not a principal in the first degree, he was constitutionally entitled to lesser included offense instructions on non-capital murder. The majority today agrees with the Supreme Court of Virginia that there was “overwhelming evidence ... that Winston was the trigger-man responsible for Rhonda’s death.” Winston v. Commonwealth, 268 Va. 564, 604 S.E.2d 21, 44 (2004). When a state court has decided whether a lesser included offense instruction is necessary, this Court has unmistakably affirmed that federal court review in the habeas context is limited by the Antiterrorism and Effective Death Penalty Act of 1996. See Hyatt, 569 F.3d at 166. Even given this deferential standard, I find the state court’s determination of the facts to be unreasonable.[1]
Evidence at trial supported Winston’s requested instructions for lesser included homicide charges and his theory that he was present at the scene but was not the triggerman, casting “some doubt” on one element necessary for his capital conviction. Niesha Whitehead, the only eye witness, testified on direct and cross to facts showing Winston was not the triggerman. In fact, Niesha, the government’s witness, did not identify Winston. On the stand, Niesha testified that it was the man wearing all black that shot her mother. J.A. 37, 45-46. She also testified that the other man was wearing stripes and tried to stop the shooter. J.A. 45. Unrebutted evidence existed that Winston was wearing stripes. Winston, 604 S.E.2d at 44. Contrary to the majority’s contention, Niesha’s testimony was not inconsistent concerning the clothing of the two men. When first asked what the shooter was wearing, Niesha responded, “All black.” J.A. 36. At that time, on direct, she stated that she could not recall whether the clothing had stripes in it. J.A. 37. Throughout the rest of her testimony, Niesha stated that *563 there was one man in “all black” and one wearing stripes. J.A. 42, 44, 46-48. She testified that it was the man in “all black” that pulled the trigger. J.A. 44-46.
Niesha also testified that the shooter was taller than her father, Anthony Robinson. J.A. 48-49. Winston was shorter than Robinson. J.A. 216, 222. The majority relies on Niesha’s testimony that a man with a tattoo was the shooter. However, Niesha was shaky on which man in the house had a tattoo, testifying both that it was the shooter and the non-shooter. J.A. 38-39, 47-48. Thus, that Winston had a tattoo is not determinative of which person was the triggerman.[2]
The majority finds that I am not “troubled” by the weaknesses in Niesha’s testimony. Supra at 546. However, the fact that Niesha’s testimony is inconsistent on which man had a tattoo does not signify that it lends no support to Winston’s requested instructions. In fact, the main inconsistency in Niesha’s testimony, which person had the tattoo, undermines the majority’s position, not Winston’s. If Niesha’s testimony were truly undermined as a whole, as the majority suggests, supra at 546-47, it seems unusual that the majority cites to her testimony in support of its position. Thus, given the dearth of evidence directly proving that Winston was the triggerman, Niesha’s testimony cast some doubt on an element necessary for Winston’s capital conviction.[3]
Other than the testimony of Rorls, whose credibility was questioned at trial, no evidence relied on by the majority can be characterized as “overwhelming” evidence that Winston was the triggerman on April 19, 2002.[4] The majority cites to evidence that only places Winston at the scene, which is insufficient for a capital conviction under Virginia law. While there was testimony that Winston’s DNA was on the gun used, this does not prove that Winston pulled the trigger on the date in question.[5] For example, Winston could have supplied the gun or he could have simply hidden the gun after the shootings to cover up his complicity. Neither of these scenarios would have made Winston death-eligible. Additionally, Niesha testified that both men were wearing gloves. J.A. 42.
Because the evidence in this case casts some doubt that Winston was the trigger-man, an element necessary for conviction of the capital offense in Virginia, Winston was entitled to an instruction on the lesser included homicide charges. Some doubt is all that is required. In finding that there was “overwhelming evidence ... that Winston was the triggerman responsible for Rhonda’s death,” Winston, 604 S.E.2d at 44, the state court made an unreasonable determination of the facts.
*564 II.
In section III.B, the majority inadequately considers Winston’s claim that his counsel was constitutionally ineffective by not reading relevant records in his possession, passing along four incomplete psychological reports to jurors without explanation, failing to mention Winston’s classification as mentally retarded, failing to present evidence of Winston’s adaptive deficits and cognitive difficulties, and presenting extraordinarily minimal mitigating evidence about Winston’s childhood in a generalized and unpersuasive manner given the reasonably accessible material available. Rather, the majority puts forth alleged arguments made by Winston that fail to represent his entire claim. Looking at the whole record and Winston’s complete argument, I must depart from the majority and find that the state court was unreasonable in dismissing Winston’s claim that he received ineffective assistance of counsel at the sentencing phase of his trial.
A.
In this case, the performance prong of Strickland entails assessing whether counsel satisfied his duty to consider and investigate mitigating evidence for sentencing in a capital case. It is a “well-defined norm[]” that “investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence.’ ” Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting American Bar Association (“ABA”), Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) 93 (1989) (hereinafter Guidelines)). According to the ABA Guidelines in effect at the time, counsel had a duty to consider presenting medical evidence, educational history, and family and social history, especially in a capital case. Guidelines 11.8.6. Counsel plainly cannot perform this duty when not reasonably informed about the case.
Although courts cannot second-guess the strategic choices of counsel, counsel must be informed to act strategically. See, e.g., Rompilla v. Beard, 545 U.S. 374, 389-90, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (concluding a decision not to pursue certain mitigating evidence cannot be strategic if it is based on inadequate investigation); Wiggins, 539 U.S. at 527-28, 123 S.Ct. 2527 (finding a cursory investigation insufficient to support any tactical decision). Here, counsel was in no way informed. Counsel testified he had no strategic reason for not pursuing further mitigating evidence. J.A. 656, 674-75, 677, 681. Furthermore, counsel failed to read records in counsel’s possession and made no reasonable effort to discover mitigating evidence that was unmistakably available. While Winston’s counsel had the assistance of an investigator, no mitigation investigation occurred nor was a mitigation specialist provided. Instead of reviewing the records regarding Winston’s case in his very possession, counsel abdicated his constitutional duty by relying on Dr. Nelson, who had been appointed to evaluate Winston, to review them.
When analyzing whether counsel’s deficient performance was cause for the procedural default of Winston’s Atkins claim, the district court correctly recognized that “capital trial counsel cannot outsource their fundamental responsibilities.” Winston v. Kelly, 600 F.Supp.2d 717, 732 n. 14 (W.D.Va.2009). The court added that “[although counsel’s ‘strategic choices made after thorough investigation ... are virtually unchallengeable,’ [Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], contextually, simply not reading essential documents that are facially significant to competent capital defense counsel did not seem to this court to be any choice at all.” Id. at *565 732, 104 S.Ct. 2052. The court inexplicably and inappropriately failed to apply this logic when deciding whether the same counsel was ineffective in failing to investigate and present mitigating evidence. See Winston v. Kelly, 624 F.Supp.2d 478, 512 (W.D.Va.2008).
While the Supreme Court has recognized that “the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up,” the Court has also found failure to review relevant files that are easily accessible can be objectively unreasonable and that reasonable counsel would investigate further in the absence of “good reason to think further investigation would be a waste.” Rompilla, 545 U.S. at 382-83, 389-90, 125 S.Ct. 2456. Without reading the records, counsel had no strategic reason to think further investigation was unnecessary. Additionally, unreasonableness can be heightened by the easy availability of the mitigating evidence. See id. at 389-90, 125 5. Ct. 2456. Here, counsel had the documents in his possession containing mitigating evidence and leads to easily-located evidence. Even a cursory review of this record shows that the district court erred when it held that the state court was reasonable in finding that counsel’s limited efforts at sentencing were not deficient.
B.
On the second prong of Strickland, the state court unreasonably determined that Winston was not prejudiced by counsel’s deficient performance. A thorough review of the record demonstrates that but for counsel’s deficient conduct, a reasonable probability exists that at least one juror would have voted against the death penalty. At sentencing, counsel presented a few witnesses, asked them yes or no questions spanning less than thirteen transcript pages, threw several incomplete psychological evaluations at the jury without explanation or context, and hoped for the best. The minimal evidence counsel did present is at stark contrast with the mountain of mitigating evidence that was readily available, including evidence of mental deficiencies and evidence of Winston’s emotional distress, neglect, and abandonment throughout childhood.
Setting aside whether Winston satisfies the Virginia definition of mental retardation,[6] evidence of mental deficiencies is certainly mitigating. Counsel here indisputably failed to present to the jury a classification of Winston as mentally retarded that was in counsel’s possession. The majority apparently finds this harmless, reasoning that “there is no reason to believe that these items [the classification of mental retardation and 1997 I.Q. score of sixty-six] would have been persuasive to the jury as ordinary mitigating evidence.” Supra at 559. This assertion misses the mark, and despite the majority labeling the classification a “single one-page document,” supra at 559, it is the only classification of Winston as mentally retarded that existed and was thus supremely relevant to assessing mitigating evidence. While a specific score may or may not be influential to a lay juror,[7] a classification *566 as mentally retarded certainly would have been materially significant to the jury when considering evidence about Winston’s subaverage intellectual functioning. The majority finds the classification immaterial by characterizing it as “more general” than the classifications of Winston’s verbal abilities that the majority assumes the jury read and could correctly interpret. Supra at 559-60. However, the 1997 evaluation in pertinent part states that
Leon earned a Verbal IQ score of 60 and a performance IQ score of 77, resulting in a Full Scale IQ score of 66. Based on his Full Scale score, Leon is currently functioning in the Mentally Deficient range of intelligence, and might be expected to achieve better than one percent of his age group in academic areas.
J.A. 1980. Thus, it is clear that a juror reading such evaluation would place more importance on a full scale classification and score than that of a sub-part. It is the full scale score that is used to classify a person as mentally retarded.
Beyond the failure to present the classification, counsel did not provide the jury with information from certain teachers, social workers, and family members whose input would have been essential to evaluate Winston’s mental state and adaptive functioning. The majority concludes that Winston is asserting that his counsel was constitutionally inadequate purely because live witnesses did not present the information. Supra at 558-59. This conclusion is incorrect. Winston’s argument is that the information was not presented at all because (1) counsel’s investigation was unreasonably wanting, Petr.’s Br. 78, and (2) “the information possessed by the jury was tremendously incomplete,” id. at 77. It is undisputed that, as discussed above, counsel did not read records in his possession nor conduct a full investigation.
As for information regarding Winston’s low intellectual functioning, the majority relies heavily on the psychological reports entered into evidence. The majority finds that the reports contained “rich content” “describing [Winston’s] many difficulties coping with his sub-average intellectual functioning.” Supra at 558, 560. However, to clarify, the evaluations constantly referenced external documents,[8] and therefore, the jurors received incomplete information even if we assume that they read and understood the evaluations. Counsel presented Crystal Carper from the Fairfax County Department of Family Services to authenticate the evaluations. As Carpenter had no personal knowledge of the evaluations, she could not speak to their information, and the documents were merely entered into evidence. Simply sending incomplete records back with the jury without explanation or context does not save counsel’s constitutionally deficient performance in this case. See Johnson v. Bagley, 544 F.3d 592, 602 (6th Cir.2008) (finding that “an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury”).
The information before the jury concerning Winston’s subaverage intellectual and adaptive functioning was also materially incomplete because counsel failed to seek out those most familiar with Winston *567 in these areas. If the jury had this information, there is a reasonable probability that at least one juror would have voted against the death penalty. That the state court found otherwise is unreasonable. As an example, two of the people that counsel did not speak with were Kirsten Jackson and Denise King. Jackson, Winston’s aunt, who was three years his junior, was never contacted by counsel despite living with Winston for almost ten years until Winston was age seventeen. Among Jackson’s testimony at the evidentiary hearing is the following:
you could tell him to wash the dishes, and you would come back and the dishes weren’t done, and he was just standing there trying to figure out what he was supposed to be doing. Anything, any chore he was supposed to be doing, you had to constantly go back and remind him....
His hygiene was good when he lived with us because my mom constantly made sure he took a bath.... And afterwards, it was — when he moved out, it was something totally different. He always looked dirty, like just smelled nasty, just untouchable. You didn’t want to touch him; that’s how dirty he looked.
I think my mom bathed him until he was about 10, 11. He had to be watched until he was about that age.
... we had one incident where he fell asleep in the tub and had a bowel movement in the tub. And we were trying to figure out where he was at and what was going on. We went upstairs, and he told us it was just toys, and he started playing with it.
You couldn’t have a conversation with him. He couldn’t comprehend what everyone was saying. Talking to him was talking on a different level. It was like you were talking to someone like — that was five or six years old, that he constantly was — like he would joke at the wrong times, or he could — if he couldn’t comprehend, like, or have the conversation that we were having, he would like sort of mimic what everyone was saying and converse in that way, and just — -it was impossible.
His idea of friendship was if he did something for them, that that was his way of getting them to like him[.]
He was never able to do his homework. Things that his teacher would send him home with, he couldn’t comprehend it, he didn’t understand it. Even if it was told to him how to do it at school, he would still come home and couldn’t figure it out, and I would have to explain to him what the teacher meant and what he was supposed to be doing. And he would generally get frustrated, agitated, and get upset, want to fight just because he didn’t know it. Just spelling and all of that, he didn’t have a good subject in school.
J.A. 725-31.
Denise King was Winston’s teacher for four years at the Leary School, a school of last resort for students in Fairfax County who were experiencing learning and behavior difficulties. King spent on average seven hours a day with Winston, then age eight, and yet she was never contacted. At the evidentiary hearing, she testified that Winston had great difficulty reading and following directions. Among King’s testimony about Winston at the hearing is the following:
He posed a particular dilemma to me because I thought I came equipped to help students with special needs, and I could not teach Leon to read; he was a *568 particularly difficult student to teach....
I always felt like Leon was not very well cared for. He was interested in school, but I think he had a lot of things going on at home.... I think even his physical needs weren’t taken care of. His clothes didn’t seem to be his own; they appeared too big for him. And we didn’t have a lunch program at the school, and Leon didn’t come with food.
I think he had auditory processing problems. He didn’t understand a lot of what he heard. If it was more than one or two directions, he had trouble following it. He misinterpreted social cues. He misinterpreted what people said. He took things very literally. I think his abstract reasoning and long-term memory were probably very limited as well.
Leon was the lowest student for the whole four years that I had him....
I don’t think he knew what a reciprocal friendship was like. A friend was somebody who was, if you were hungry, would give you a cookie, or if you were thirsty, would give you a soda. But other than that, I don’t think that he even understood what friendships and that kind of thing were all about.
He had no real sense of time. You know, it’s dark outside or it’s light outside, but other than that, not really.
And Leon did not have any idea where the school was in reference to where he lived.... And he wouldn’t leave early because he didn’t know how to get home.
I saw very small changes in his academics .... There are students that, yes, would adapt to the situation, and once they got into sort of the groove of how the school goes, that’s when they catch on and they really start to learn. That was not the case with Leon. He never got it. He never understood how school went and how — it was every day was a new day, every day.
J.A. 741-54.
In addition to testimony from Kirsten Jackson and Denise King, other evidence of mental deficiencies not presented due to counsel’s failures includes the following:
1. Fairfax schools classified Winston as mentally retarded in 1997, as mentioned above, J.A. 1876;
2. The 1997 classification, as well as other documents in counsel’s possession, identified Marilynn Schneider Lageman (“Lageman”) as a psychologist and a member of the Special Education committee that recommended the 1997 evaluation. Winston produced a 1997 evaluation by Lageman conducted on Winston, which included a verbal I.Q. score of sixty and a full-scale I.Q. score of sixty-six. This full-scale score is more than two standard deviations below the mean, compelling evidence of mental retardation under the Virginia definition. Lageman was never contacted, J.A. 1232,1876;
3. By 1997, sixteen year-old Winston demonstrated “verbal cognitive skill development within the mild range of mental retardation for his age,” J.A. 1980;
4. Winston’s 1997 “evaluation [showed] a fairly evenly delayed profile of cognitive, social, and emotional functioning, generally within the mild range of mental retardation,” J.A. 1982;
*569 5. Winston failed kindergarten twice and had severe academic struggles, J.A. 1909;
6. By age fourteen-and-a-half, Winston had not developed age-appropriate ability to tell time or learn the months of the year, J.A. 751-52;
7. Lageman noted “[i]t [was] particularly surprising how little Leon appeared] to understand social expectations and the reasons behind social practices.” J.A. 1980;
8. After being placed in the custody of Fairfax County, Winston “had extremely low intellectual functioning” and experienced severe emotional distress, J.A. 1359,1799;
9. Winston’s handling of money was “inadequate by almost any standard” and he “never had a checking account, a savings account, a credit card, an apartment/home lease or ownership in his name,” J.A. 1257;
10. Winston never had a job of any type other than selling drugs on the street; even at this, other persons gave him instructions and the drugs in pre-divided quantities with set prices, J.A. 896-97, 1258.[9]
Additionally, because not reasonably informed, counsel failed to present consequential evidence of Winston’s childhood of emotional distress, neglect, and abandonment, including the following:
1. Winston’s mother could not stand to be around him and was violent with her children, J.A. 429;
2. The “void left by his mother’s absence was never filled, and the negative influence(s) of her criminal activity were never replaced with positive ones,” J.A. 1358;
3. While the jury did hear that Winston’s grandmother ran a shoplifting operation, it did not hear that it was Winston who blew the whistle on the operation when he was picked up by Fairfax County Juvenile Detention after his family left him behind and fled as the operation was busted, J.A. 1352;
4. Because Winston had no real caretaker in his life, he “was denied a real feeling of family and belonging,” J.A. 1358;
5. At age fifteen, Winston was “struggling significantly with trust versus mistrust issues due to all the abandonment and loss in his lifetime.” J.A. 72;
6. At the Leary School, Winston was “struggling to make sense out of the world” because of his abandonment and upbringing, J.A. 1345;
7. A teacher at Leary noticed that “Leon’s concept of right and wrong never stood a chance,” J.A. 1347;
8. Winston was easily manipulated, had few or no friends, and was never fully accepted by any peer group, J.A. 1347,1370;
9. Winston was consistently described by family, counselors, and teachers as a child characterized by gullibility, immaturity, passiveness, a lack of self-esteem, and a desperate need for peer acceptance, J.A. 1255-56;
10. Winston was diagnosed with Fetal Alcohol Syndrome, J.A. 1271.
*570 In spite of all the above evidence not presented to the jury, the state court found no prejudice on the ground that the evidence was cumulative. I can find no reasonable theory under which the evidence disregarded could be considered cumulative.
The negligible evidence of Winston’s childhood that was before the jury gave an “incomplete and misleading understanding of [Winston’s] life history.” Williams v. Allen, 542 F.3d 1326, 1331, 1340 (11th Cir.2008). As I found previously, the evaluations were both unexplained and incomplete. Also, counsel presented three witnesses to speak solely on Winston’s social history: his mother, grandmother, and great grandmother. In totality, these witnesses represent less than thirteen transcript pages and provided only vague generalities about Winston’s upbringing, generally through yes or no answers. Consider an excerpt from Winston’s mother’s testimony at sentencing:
Q. And how old was he when you went to the penitentiary?
A. Six and a half.
Q. Okay. And what are you in the penitentiary for?
A. Malicious wounding, firearm and robbery.
Q. Was Leon with you when that crime was committed?
A. Yes, sir.
Q. Has Leon’s father ever been involved in his life?
A. No, sir.
Q. When you became pregnant with Leon, what were some of your habits?
A. You mean as—
Q. Well, did you stick strictly to drinking tea and milk and things like that or did you drink something else? A. Alcohol. I did drugs.
J.A. 240-41. When contrasting the one- or two-word answers by three witnesses with the mitigating evidence available, the state court unreasonably determined that but for counsel’s deficient conduct, a reasonable probability did not exist that at least one juror would have voted against the death penalty. For example, Winston’s mother never described him as a child, never told a story of him growing up, nor provided any examples to humanize him. Astoundingly, she was never asked to. This dearth of even the most basic details of Winston’s childhood[10] stands in stark contrast to his mother’s affidavit, submitted two years later:
I was 15 years old when I got pregnant with Leon. I was never in a relationship with his father, Leon Johnson. I knew his father because he was a junkie and I was doing a lot of drugs and drinking at the time. When Leon Johnson found out that I was pregnant, he denied that it was his baby. I have never seen him since then.
I remember that it took Leon a long time to learn how to use the toilet by himself. After he stopped using diapers, he used to wet the bed a lot as a child. He also had problems talking— he stuttered a lot. Leon had a really hard time understanding directions I would give him. For instance, I remem *571 ber that I would often ask him to get me “the chair,” and I would point toward the chair that we kept next to the refrigerator in the kitchen. He did not seem to understand what I was talking about; he would just look back at me and say, “which chair,” even though it was the only chair in the kitchen and the same chair I always wanted him to get for me....
I continued to drink and use drugs after Leon was born and during and after I was pregnant with my other two sons. During the times that I was living with my children, I would drive them to school. After I dropped them off at school, I would go to the liquor store when it opened at 10:00 a.m. I would buy a pint of Barcardi rum and go to my friends’ house and drink it during the day. Sometimes I would finish it by the time I went to pick up the kids, and sometimes I wouldn’t. I would usually go get some food at Burger King or McDonalds to try to bring down my high around the time I picked up my kids. I was also using still using [sic] drugs when the kids were in school....
Leon started school before I went to prison. On some days, I was sober enough in the afternoon to try and help Leon with his homework. He had a really hard time with it, and I always thought that he was going to have problems learning. Leon had these ABC blocks, but he could never manage to put them in the right order.... There were times when we lived with my family members and times when we lived with my boyfriends. We moved around a lot.... I often left Leon with my family so that I could go hang out with my friends and get drunk and high.
When I was dating Raymond Jackson, Leon told me once that Raymond beat him when I wasn’t around.
... I saw marks and bruises on his back once.... I just wasn’t much of a parent to my children. I did not give them the love and attention they deserved to have. Two of my three children are currently in prison.
J.A. 1361-62. The dramatic detail contained in this affidavit plainly was not presented to the jury. Rather, counsel’s presentation about Winston’s childhood was haphazard and woefully incomplete.
Given the evidence cited herein of Winston’s mental deficiencies and traumatic childhood, coupled with the absence of evidence that Winston was the triggerman, there is a reasonable probability that at least one juror would have voted against the death penalty.[11] As the Supreme Court found in Rompilla, 545 U.S. at 393, 125 S.Ct. 2456 (citations omitted), the evidence now before this Court
adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although ... it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered “mitigating evidence, taken as a whole, ‘might well have influ *572 enced the jury’s appraisal’ of [Winston’s] culpability,” and the likelihood of a different result if the evidence had gone in is “sufficient to undermine confidence in the outcome” actually reached at sentencing.
III.
In this capital case, the performance of counsel was abysmally deficient. Had the jury been able to place Winston’s troubled childhood and background, along with the evidence of his mental deficiencies, “on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.” Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. Additionally, I would find that Winston was unconstitutionally denied lesser included homicide instructions. Accordingly, I would reverse the state court’s adjudication of Winston’s ineffective assistance of counsel claim and due process claim as unreasonable and remand for re-sentencing. On this basis, I dissent.

. Contrary to the majority’s assertion, the state court's determination that there was "overwhelming evidence” pointing to Winston as the triggerman is not exclusively a legal determination. Supra at 546. The slate court correctly identified the applicable law to resolve this issue. However, the court’s reading of the facts is what I find not only incorrect but also unreasonable.
If the majority does read the court’s statement as a legal determination, then the state court engaged in an unreasonable application of clearly established federal law. "Under Beck, courts are not directed to evaluate the evidence to determine whether it would support a first degree murder conviction, or even whether a conviction for first degree murder or a lesser-included offense is better supported.” Taylor, 554 F.3d at 887. Rather, "[t]he proper inquiry is whether the defendant presented sufficient evidence to 'allow a jury to rationally conclude’ that the defendant was guilty of the lesser-included offense.” Id. at 888 (citation omitted). Thus, if, as the majority suggests, the state court determined that the lesser included offense instruction was not warranted "in light of” the evidence supporting the capital murder charge, it unreasonably applied Beck.

. Other than which person at the scene had a tattoo, Niesha's testimony was consistent with the fact that Winston was not the triggerman.

. Niesha’s testimony was not the type of self-serving testimony of a criminal defendant or of an incredible witness with a bias towards the defendant. Her testimony in favor of Winston was first elicited by the Commonwealth.

. Contrary to the majority’s assertion, I do not minimize the significance of relevant evidence. In fact, it is not our job to weigh the evidence or search for evidence to support the instruction given. While I recognize that there is evidence in support of the jury's verdict, this is not a sufficiency of the evidence issue. The question is whether the evidence at trial cast some doubt that Winston was the triggerman — whether the state court made an unreasonable determination of the facts in finding that the evidence that Winston was the triggerman was "overwhelming.”

. The majority cannot simply draw "inferences” in only one direction. Supra at 546-47. Again, this is not a sufficiency of the evidence issue.

. Based on the evidence before this Court, Winston has a strong claim that he is mentally retarded under Virginia law and that the default of that claim should be excused based on cause and prejudice resulting from ineffective assistance of counsel. I therefore fully concur with our decision today to remand this case to the district court so that it may properly consider evidence that came to light at the evidentiary hearing.

. The majority cites to several of Winston's verbal I.Q. scores as evidence before the jury of Winston's deficient verbal abilities. If these scores are material to the jury’s evaluation, then surely the same must be said of an overall I.Q. score of sixty-six, lower than all the overall I.Q. scores contained in the reports handed over to the jury. And if the majority assumes the jury could interpret the verbal I.Q. scores and classifications, by the *566 same token we should assume the jury understands that a full scale I.Q. score is the score used to classify a person as mentally retarded.

. Historical and detailed information about Winston was referenced in the documents, but not provided. As an example, the 1995 evaluation states that "[d]etails of Leon’s family life are available to the court, and so will not be reported here in great detail.” J.A. 2075. The "details” referred to were never provided to the jury.

. Despite the majority's herculean efforts to comb the record and find some of the facts listed buried in the reports entered into evidence, supra at 560, the jury found no mitigating factor. Thus, we cannot ascertain whether the jury glanced at the reports, much less considered the reports in depth as the majority has. The jury was given little reason to read the reports. The reports were given no context or explanation. Not one witness spoke personally to any of the information contained in the reports. Furthermore, as mentioned previously, the reports were materially incomplete.

. The majority finds that "counsel did present the basic details of Winston’s admittedly troubled childhood to the jury." Supra at 560. It is difficult to imagine a capital case in which less testimony at sentencing was presented by defense counsel. The thirteen transcript pages relied on by the majority is bereft of anything approaching the meaning of "details.”

. To exacerbate this prejudice, the nature of the information not presented is exactly the type that jurors find persuasive. Evidence of a diminished mental capacity, along with evidence of a traumatic childhood is precisely the kind of evidence that reduces a defendant’s moral culpability and provokes sympathy from the jury. This Court has found that evidence of mental deficiencies “can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome." Gray v. Branker, 529 F.3d 220, 235 (4th Cir.2008); cf. Smith v. Mullin, 379 F.3d 919, 942 (10th Cir.2004) (finding that evidence of mental deficiencies "garners the most sympathy from jurors”).