RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
—————————————

STEVEN SMITH,

*Petitioner-Appellant,*

*v.*

No. 07-4305

MARGARET BRADSHAW,

*Respondent-Appellee.*

—————————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00694—Kathleen McDonald O'Malley, District Judge.

Argued: July 29, 2009

Decided and Filed: January 19, 2010

Before: BATCHELDER, Chief Judge; and BOGGS and GILMAN, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Joseph E. Wilhelm, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Joseph E. Wilhelm, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

BOGGS, J., delivered the opinion of the court, in which BATCHELDER, C.J., joined. GILMAN, J. (pp. 12-17), delivered a separate concurring opinion.

—————————————

## OPINION
—————————————

BOGGS, Circuit Judge. Steven Smith is an Ohio inmate sentenced to death for raping and murdering a six-month-old baby. We affirm the district court's denial of a writ of habeas corpus.

1

I.  Background

On September 28, 1998, Smith was living with his girlfriend, Keysha Frye, and her two young daughters, two-year-old Ashley and six-month-old Autumn.  That evening, Smith drank three beers while he, Frye, and the children visited a friend.  On the way home, Smith bought a twelve-pack of beer and drank one in the car.  Once back at Frye's apartment, Smith and Frye put the children to bed, then watched television and had sex.  Frye went to bed around 11:00 p.m., but Smith stayed up drinking.

At approximately 3:22 a.m., Smith woke Frye by placing Autumn's naked body next to her.  Frye realized that Autumn was not breathing and accused Smith of killing her; Smith threw an alarm clock and said that she was not dead.  Frye quickly took Autumn's body and Ashley to a neighbor's apartment, screaming that Smith had killed her baby.  Smith followed, exclaiming that he "didn't do anything" and asking "why was she fucking lying," but the neighbor did not let him in.  A short while later, another neighbor observed Smith throw a trash bag in the dumpster and heard Smith say that he did not do anything and that he was leaving.  This neighbor convinced Smith not to leave.

When the police arrived, they saw no signs of forcible entry in Frye's apartment, and they found the television on and extremely loud.  They discovered Autumn's pink baby sleeper under the coffee table and Smith's cutoffs and jeans near the couch.  They also found whitish-colored material, later determined to be pieces of shredded diaper, scattered on the floor in the same area, and piles of Autumn's hair were found on the coffee table.  The police also retrieved a garbage bag from the outside trash dumpster that contained a torn baby diaper, Smith's t-shirt, and ten empty beer cans.

When approached by an officer, Smith preemptively exclaimed, "I didn't do it, I didn't do it"; he smelled of alcohol and swayed back and forth while speaking.  At the police station, Smith told detectives that he had drunk four beers that night.  He stated that he and Frye had gone to bed at midnight and that he was awakened by Frye, who was accusing him of killing Autumn.  A month later, Smith changed his story, telling police that he had consumed nine beers, and that he awoke downstairs at 3:25 a.m. and, believing that something was wrong with Autumn, carried her upstairs.  He also denied putting trash in the dumpster.

Smith was charged with aggravated murder for raping and killing a child under the age of thirteen. At trial, the coroner who performed the autopsy testified extensively, using autopsy photographs and slides. He explained that Autumn died from compression asphyxia and blunt trauma to the head. The injuries to her head and the abrasions on her forehead, cheek, and chin indicated that she was lying on her abdomen and that her face had been forced into a pillow. Contusions to her buttocks indicated that they were subject to pressure from the weight of another person. Other bruising and abrasions revealed that Autumn had resisted the attack. She also suffered subarachnoid and retinal hemorrhages consistent with shaken baby impact syndrome, indicating that she had been restrained, and she was missing hair from the back of her head, suggesting that the attacker had forcefully grasped it. Furthermore, her clitoris was red, her vagina was ten times the normal size for a baby her age, and there was a hemorrhage in her anus, all indicative of attempted penetration. Additionally, Autumn's blood was found on two seat cushions and on her pink sleeper. No semen was found.

Smith offered the testimony of a board-certified forensic toxicologist to support his intoxication defense. The police tested Smith's blood-alcohol level at 11:00 a.m. on September 29, approximately seven hours after he was arrested, as 0.123%. The toxicologist testified that, based on this result, Smith's blood-alcohol level would have been at least 0.36% and possibly as high as 0.60% at 11:30 p.m. on September 28. Smith also offered evidence that he drank as many as fifteen beers that night, and that he was an alcoholic who drank heavily and frequently blacked out.

The jury found Smith guilty as charged and sentenced him to death. The Ohio Supreme Court affirmed Smith's conviction and sentence on direct appeal, *State v. Smith*, 780 N.E.2d 221 (Ohio 2002), and the Ohio Court of Appeals denied his petition for postconviction review. The district court denied Smith's petition for a writ of habeas corpus. Smith appeals, having received a certificate of appealability on four claims: (1) that the prosecutor improperly commented on his failure to testify; (2) that the penalty-phase jury instructions were misleading; (3) that counsel was constitutionally ineffective for failing to object to the misleading penalty instructions and for not requesting clarifying instructions; and (4) that the trial court should have instructed the jury on the lesser included offense of involuntary manslaughter.

## II.  Standard of Review

When a state court has "adjudicated . . . the merits" of a defendant's claim, we may only grant a writ of habeas corpus if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  An adjudication on the merits is contrary to clearly established Supreme Court law if, for example, the "state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An adjudication on the merits unreasonably applies Supreme Court law if, for example, "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407.  The application must be "objectively unreasonable," not merely incorrect. *Id.* at 409–10.  When a state court's adjudication on the merits is either contrary to or an unreasonable application of clearly established Supreme Court precedent, we "must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

## III.  Prosecutorial Misconduct

Smith's first claim is that the prosecutor improperly commented on his failure to testify during the guilt phase by telling the jurors to ask themselves, "[d]id [Smith] claim accident, that he didn't do this on purpose?" *See Griffin v. California*, 380 U.S. 609, 615 (1965).  This claim is procedurally defaulted: counsel failed to object to the comment at trial, and the state court enforced the procedural bar by reviewing the claim only for plain error. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

Smith asserts that we should not enforce his default.  But his claim that the state courts do not regularly enforce Ohio's contemporaneous objection rule is "squarely foreclosed" by our precedent. *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007) (holding that Ohio's state courts have not "applied its contemporaneous objection rule unevenly and inconsistently" with regard to prosecutorial misconduct claims).  And he cannot excuse his default through the ineffectiveness of counsel because he cannot show that counsel's failure to object to this one comment—thereby drawing attention to it—was

deficient. *Lundgren v. Mitchell*, 440 F.3d 754, 774–75 (6th Cir. 2006) ("[A]ny single failure to object [to closing arguments] usually cannot be said to have been error . . . . [D]efense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.").

## IV. Misleading Jury Instructions

We address Smith's second and third claims together because both relate to the penalty-phase jury instructions. Smith's second claim is that the penalty instructions violated *Caldwell v. Mississippi*, 472 U.S. 320 (1985), because they "affirmatively misled [the jury] regarding its role in the sentencing process," *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Under Ohio law, the jury must unanimously recommend the death penalty; thus, "a solitary juror may prevent" it. *State v. Brooks*, 661 N.E.2d 1030, 1042 (Ohio 1996). Smith contends that the instructions wrongly suggested that the jury was required to *reject* the death penalty unanimously, rather than to choose it unanimously.

This claim is also procedurally defaulted. Counsel did not object to the instructions as given. Smith wrongly suggests that the state court did not enforce the procedural bar because it did not discuss this claim "in terms of 'plain error.'" After reviewing the several jury-instruction claims that Smith had preserved for appeal, the court stated: "As for the remaining arguments regarding jury instructions, since Smith did not raise an objection, we apply a plain-error analysis"; it then rejected, inter alia, this claim. Thus, the court enforced the procedural bar, *see Seymour*, 224 F.3d at 557.

Smith's third claim is that his counsel was ineffective for failing to object to the penalty instructions as misleading and for not requesting an additional instruction explicitly stating that a solitary juror could prevent the death penalty. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Although the state court rejected this claim on the merits, we review it de novo because Smith also argues that it excuses the default of his second claim. *See Girts v. Yanai*, 501 F.3d 743, 753 (6th Cir. 2007).

Smith's counsel was not ineffective for failing to object to the instructions as given because they were not misleading. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)

("[C]ounsel cannot be ineffective for a failure to raise an issue that lacks merit."). The instructions stated: "You shall impose the death sentence *only if all 12 of you* unanimously find [that the death penalty is appropriate]. You shall impose one of the life imprisonment verdicts if all 12 of you do not unanimously find [that the death penalty is appropriate]" (emphasis added). This unmistakably informed the jury that the death penalty must be endorsed by every juror, and thus that one juror could prevent it. *Cf. Hartman v. Bagley*, 492 F.3d 347, 362–65 (6th Cir. 2007) (rejecting an identical claim about the instruction, "[I]f . . . you cannot unanimously agree that the [death penalty is appropriate], . . . you will then [impose a life sentence]"). No other aspect of the instructions or the verdict forms undermined this clarity.

Smith's counsel was also not ineffective for failing to request an additional "solitary juror" instruction, to which Smith was entitled under Ohio law, *Brooks*, 661 N.E.2d at 1042. Even if Smith's counsel was deficient for failing to request the additional instruction, Smith cannot show a reasonable probability that the instruction would have led to a different outcome: the instructions as given adequately informed the jury that a single juror could prevent the death penalty, and thus an additional instruction would not have told the jury anything it did not already know.

## V. Lesser-Included-Offense Instruction

Smith's final claim is that the trial court erred in refusing to instruct the jury on involuntary manslaughter. In capital cases, *Beck v. Alabama* requires that the jury be instructed on a noncapital lesser-included offense if, and only if, "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." 447 U.S. 625, 635 (1980) (internal quotation marks omitted). *Beck* explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting of a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637.

Under Ohio law, involuntary manslaughter is a lesser included offense of aggravated murder, distinguished by the lack of intent to kill. *State v. Campbell*, 630 N.E.2d 339, 349

(Ohio 1994). Smith contends that the trial court should have instructed the jury on involuntary manslaughter because, while there was overwhelming evidence that Smith raped and killed Autumn, the evidence of his voluntary intoxication would allow a rational jury to reasonably doubt whether he intended to kill her. The state court denied this claim on the merits, carefully recounting Autumn's injuries and concluding that no reasonable juror could have found that Smith did not intend to kill her, given the brutality and duration of the crime.

Smith contends that the state court's decision is both contrary to and an unreasonable application of *Beck*. He argues that the decision is contrary to *Beck* because the court did *not*, in fact, determine whether a rational jury reasonably could have doubted his intent to kill; rather, he maintains that the court rejected his claim only because he did not provide evidence of a specific intent to molest Autumn and because the evidence was sufficient to support the verdict. This argument fails. The court noted that Smith had not provided any evidence of an intent only to molest rather than to kill. Also, Smith never admitted that he molested her. And, while the state court's opinion is not ideal, it plainly did not review the verdict only for the sufficiency of the evidence: the court properly recited *Beck*'s rule, it relied on three cases that properly applied *Beck*, and its analysis is consistent with *Beck*. Smith has failed to rebut the "presumption that state courts know and follow the law," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

Smith's argument that the state court unreasonably applied *Beck* requires more analysis, but also fails.[1] It is well established that a lesser-included-offense instruction is not required where the facts of a murder so strongly indicate intent to kill that the jury could not rationally have a reasonable doubt as to the defendant's intent. *See, e.g.*, *Hopper v. Evans*, 456 U.S. 605, 613 (1982) (denying a *Beck* claim where the defendant's testimony and evidence that he shot the victim in the back during an armed robbery "affirmatively negated any claim that he did not intend to kill the victim"); *Campbell v. Coyle*, 260 F.3d 531, 543–44 (6th Cir. 2001) (holding that the defendant's *Beck* claim failed because the number and location of the victim's five stab wounds "compelled a

---

[1]Because we reject Smith's claim on the merits, we need not decide whether harmless error review can apply to *Beck* claims. *Compare Hogan v. Gibson*, 197 F.3d 1297, 1312 n.13 (10th Cir. 1999) (holding that it does not); *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988) (same), overruled on other grounds as recognized by *Vanderbilt v. Collins*, 994 F.2d 189, 195 (5th Cir. 1993), *with Gerlaugh v. Stewart*, 129 F.3d 1027, 1031 (9th Cir. 1997) (applying *Brecht*'s harmless error standard to a *Beck* claim).

reasonable jury to find that the [defendant] possessed the intent to kill," despite evidence of a struggle); *see also Slaughter v. Parker*, 450 F.3d 224, 236–38 (6th Cir. 2006) (rejecting a *Beck* claim in the alternative because the "facts [that the victim was bludgeoned in the head and stabbed five times] foreclose the conclusion that [the defendant] acted with any mental state other than intent"); *Abdus-Samad v. Bell*, 420 F.3d 614, 629 (6th Cir. 2005) (rejecting a *Beck* claim in the alternative because "[t]he fact that [the defendant] shot the victim with a pistol five to six times makes it virtually impossible to find that the killing was accidental").

This case law reflects the sensible view that, as a general matter, repeated violent conduct conclusively proves intent to kill. Autumn's death reflects such conduct: for ten to thirty minutes, Smith violently raped a six-month-old baby, during which time the baby resisted the attack and Smith forcibly subdued her by forcing her face into a pillow, ripping out her hair, shaking her, and causing deadly blunt force trauma to her head. Compared to the overwhelming proof of intent from such directed and persistent brutality, Smith's intoxication evidence, which was not connected to any testimony that he was too drunk to form any intent, does not allow a juror rationally to acquit him of aggravated murder. *Cf. Palmer v. Bagley*, 330 F. App'x 92, 99–100 (6th Cir. 2009) (concluding "that a jury could not rationally have found that [the defendant] lacked the specific intent to kill each victim" where both were shot twice in the head at close range, "execution-style," despite the defendant's evidence that he was severely intoxicated from alcohol and LSD, that there had been a struggle, and his testimony that he did not intend to kill the victims). Therefore, we cannot say the state court's decision was unreasonable.

Smith's case may be compared usefully with the cases cited in the previous two paragraphs. Smith's fundamental claim is that a jury could reasonably make the leap from his obvious intoxication to the conclusion that he did not intend to kill Autumn Frye. And, it is certainly not physically or logically impossible that he did not harbor such an intent, because the ultimate fact of intent can only be inferred, rather than ever known.

However, what Smith seeks from a jury would be a leap of faith, not an inferential leap based on evidence. We note that Smith did not contend, through his own testimony or any other type of circumstantial evidence, that he intended only molestation, but not killing. His basic position was always that no molestation occurred.

In the cases cited above, it was equally true that it was not physically or logically impossible that there was no intent to kill. In *Hopper*, it was not impossible that a gunman firing a shot that struck the victim in the back intended only to frighten or wound. In *Campbell*, it was not physically impossible that an assailant in a struggle might strike five wounds in the chest while intending only to disable but, as Judge Gilman's opinion there ably showed, a conclusion need not be impossible to be unreasonable. 260 F.3d at 543–44. Similarly, the wounds delivered in *Slaughter* and in *Abdus-Samad* could in principle have been inflicted by a flailing assailant intending only minatory action, but there was no evidence that this theoretically possible situation occurred, just as in our case there is no evidence from which a jury could reasonably draw the conclusion that Smith intended some outrage, but not killing. In particular, the evidence showed not only simple asphyxiation, which might in theory have been caused only by Smith's weight pressing on the baby in the course of a rape. Instead, the evidence directly showed blunt trauma to the head and shaken baby impact syndrome, indicative of lethal force purposefully applied.

And even if the state court's analysis under *Beck* were unreasonable, we would analyze  Smith's claim under de novo review, *Panetti*, 551 U.S. at 953, and reject it because his evidence of intoxication was insufficient as a matter of state law to negate intent to kill. A lesser-included-offense instruction is required only where "the facts of the case *and the laws of the State* warrant such an instruction." *Hill v. Black*, 920 F.2d 249, 251 (5th Cir. 1990) (emphasis added); *cf. Hopkins v. Reeves*, 524 U.S. 88, 95–99 (1998) (holding that *Beck* requires instruction only on crimes that are lesser included offenses under state law); *Spaziano v. Florida*, 468 U.S. 447, 456–57 (1984) (holding that a lesser-included-offense instruction was not required when the lesser offense's state-law statute of limitations had run).

Under *Montana v. Egelhoff*, states may regulate when—or if—evidence of voluntary intoxication can negate specific intent. 518 U.S. 37, 56 (1996). We agree with our apparently unanimous sister circuits that, given *Egelhoff*, *Beck* claims based on voluntary intoxication that negates intent will fail unless the evidence of intoxication satisfies the state law requirements for negating intent. *See, e.g.*, *Spears v. Mullin*, 343 F.3d 1215, 1244–45 (10th Cir. 2003) (applying Oklahoma's rule that the defendant must be "so intoxicated that his mental abilities were overcome or that the intoxication prevented him from acting with malice"); *Skipper v. Lee*, 238 F.3d 414 (Table), 2000 WL 1853330, at *5 (4th Cir. 2000) (applying North Carolina's rule that the defendant must produce "substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill"); *Goodwin v. Johnson*, 132 F.3d 162, 191–92 (5th Cir. 1997) (holding that "the laws of [Texas] foreclose our finding a *Beck* violation on the basis [of] evidence of [the defendant's] voluntary intoxication" because Texas does not allow voluntary intoxication to negate intent); *Clabourne v. Lewis*, 64 F.3d 1373, 1379–81 (9th Cir. 1995) (explaining that in evaluating *Beck* claims based on intoxication, the court must "first consider whether Arizona recognizes intoxication as a defense to the premeditation element of first-degree murder").

At the time of Smith's conviction, Ohio law allowed voluntary intoxication to "create a reasonable doubt as to" the defendant's intent to kill "[o]nly where the defendant was so intoxicated as to be mentally unable to intend anything."[2] *State v. Otte*, 660 N.E.2d 711, 720 (Ohio 1996). Thus, even belief in a claim (not made here) that Smith only intended rape, but not murder, would not justify the instruction. The state court rejected Smith's request for a voluntary-intoxication instruction, concluding that the evidence demonstrated that he could "intend [some ]thing" at the time of the murder. Smith's claim that this holding was error was not certified for appeal, and the state court's holding therefore forecloses his *Beck* claim: as a matter of state law, Smith's intoxication evidence could not create a reasonable doubt as to his intent to kill.

---

[2]Effective October 2000, Ohio eliminated voluntary intoxication as a defense to specific intent. *See* Ohio Rev. Code § 2901.21(C) ("Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense.").

Nonetheless, we note our agreement with the state court's conclusion. As we explained above, the facts of the crime demonstrate that Smith could "intend [some]thing." So do his actions immediately before and after the murder. Smith apparently was aware enough to: turn up the volume on the television to drown out Autumn's cries; remove her baby sleeper and tear apart her diaper; carry her body upstairs to her mother; have conversations with the neighbors and the police, and deny responsibility for her death repeatedly; and clean up the evidence of the murder and throw it away. These are not the aimless and uncontrolled actions of an individual incapable of "intend[ing] anything." *Cf. Otte*, 660 N.E.2d at 720–21 (finding that the defendant was not "so intoxicated as to be mentally unable to intend anything" because, inter alia, he turned up the volume of the television to drown out the victims' cries, he shot them in the head, and he left the crime scene); *State v. Tillman*, 2000 WL 1682, at *3 (Ohio App. Dec. 20, 1999) (rejecting a request for voluntary-intoxication instructions where the defendant was able to ride a bike and "complet[e] the physical acts necessary for his part in getting aboard and absconding with [the victim's] vehicle," and where the defendant's assault of the victim indicated "the cognitive wherewithal to understand that the vehicle's owner stood as an impediment to getting away with the crime"); *State v. Adkins*, 1997 WL 66763, at *3 (Ohio App. Feb. 11, 1997) (rejecting a request for voluntary-intoxication instructions because, although the defendant was too intoxicated to give a statement to police upon arrest, he had been able to drive a car, have a conversation, and retrieve a gun before the murder).

## VI.  Conclusion

We AFFIRM the district court's denial of habeas relief.

---

**CONCURRENCE**

---

RONALD LEE GILMAN, Circuit Judge, concurring.  I concur in Parts III (prosecutorial misconduct) and IV (misleading jury instructions) of the lead opinion without reservation.  Because Ohio state law at the time of Smith's conviction severely restricted the consideration of his intoxication evidence to the point of rendering it unhelpful to Smith, I also reluctantly join in Part V (the lesser-included-offense instruction).  But I write separately to express my concerns regarding the Ohio Supreme Court's analysis of the issue of the lesser-included-offense jury instruction under *Beck v. Alabama*, 447 U.S. 625 (1980).

In *Beck*, the Supreme Court held that the death penalty may not be imposed where the jury is "not permitted to consider a verdict of guilt of a lesser included non-capital offense, and [where] the evidence would have supported such a verdict."  447 U.S. at 627.  The petitioner in that case, Gilbert Beck, participated in a robbery with an accomplice.  *Id*. at 629-30.  Beck maintained that he never intended to kill the victim, and that his accomplice unexpectedly struck and killed the man after Beck had bound him to a chair.  *Id.*

The state charged Beck with intentional killing during the course of a robbery, and the trial judge was precluded by a state statute from instructing the jury as to the lesser-included offense of felony murder.  *Id.*  at 630.  After Beck was convicted and sentenced to death, his punishment was upheld by the Alabama Supreme Court.  *Id.*  at 632.  The United States Supreme Court reversed, identifying the need for a "procedural safeguard" that would "afford[] the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal."  *Id*. at 633, 637.  In particular, the Court recognized that

> when the evidence unquestionably establishes that the defendant is guilty
> of a serious, violent offense—but leaves some doubt with respect to an
> element that would justify conviction of a capital offense—the failure to

give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Id.* at 637.

*Beck* therefore identifies the need to provide jurors with this "third option" in order to avoid two polar-opposite results: convicting a defendant based on a "belief that the defendant is guilty of some serious crime and should be punished," or acquitting a guilty defendant based on the belief that, "whatever his crime, the defendant does not deserve death." *Id.* at 642-43. And although both of these two outcomes are undesireable, the "fundamental concern" in *Beck* is "that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad v. Arizona*, 501 U.S. 624, 646 (1991).

When evaluating Smith's appellate argument that he was entitled to an involuntary manslaughter instruction (which, unlike the charge of aggravated murder, does not require a showing of an intent to kill), the Ohio Supreme Court misapplied *Beck* in two respects. The Court first noted that, contrary to Smith's contention, "he presented no evidence at trial indicating that he intended to sexually assault, rather than kill, Autumn." *State v. Smith*, 780 N.E.2d 221, 228 (Ohio 2002). (The lead opinion echoes this assertion, stating that Smith did not present any evidence "that he intended only molestation." (Lead Op. at 9)) Lack of proof from the defendant, however, is irrelevant under *Beck* because a reviewing court's analysis is limited to whether the evidence as a whole supports the giving of such an instruction. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982). Moreover, the defendant in a criminal case is never obligated to present any evidence. *United States v. Hynes*, 467 F.3d 951, 957 (6th Cir. 2006) (approving the use of a jury instruction stating that the "[d]efendant has no burden to prove his innocence or to present any evidence or to testify"). The Ohio Supreme Court thus improperly implied that Smith bore the burden of providing exculpatory evidence regarding his intent, whereas *Beck* in fact imposes no such burden.

Second, the Ohio Supreme Court summarized Autumn's injuries and the testimony about those injuries in a scant few sentences to conclude that Smith had the intent to kill. *Smith*, 780 N.E.2d at 228. In doing so, the Court held that there was sufficient evidence to reach this conclusion. *See id.* ("Consequently, we reject Smith's argument that evidence of purpose was lacking."). But a *Beck* analysis is not a sufficiency-of-the-evidence inquiry. *Hyatt v. Branker*, 569 F.3d 162, 174 (4th Cir. 2009) ("A *Beck* challenge does not question whether the prosecutor presented evidence sufficient to sustain a conviction of a capital offense."); *Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (observing that *Beck* "requires a court to consider whether there is sufficient evidence to warrant instructing a jury on a lesser included offense, not whether there is sufficient evidence to warrant conviction on the greater offense").

The Ohio Supreme Court conducted no analysis to consider whether the evidence would permit a reasonable juror to find that Smith intended only to rape Autumn and not to kill her. Instead, the Court focused its attention solely on whether the evidence supported a finding that Smith intended to kill Autum, thereby overlooking its duty to consider whether the evidence cast "some doubt" as to Smith's intent to kill. *See Beck*, 447 U.S. at 637.

And the evidence presented at trial, in my opinion, did exactly that. First, there was evidence that Smith was highly intoxicated, which in turn would have made him less aware of the consequences of his aggressive behavior on a six-month-old child. The proof indicates that, during the course of the evening, Smith consumed at least ten cans of beer. He had a blood-alcohol level of .123 when he was tested by the police more than seven hours after the incident. Based upon this evidence, a board-certified toxicologist testified at trial that Smith's blood-alcohol level would have been at least .36 and possibly as high as .60 shortly before midnight. Other witnesses testified that Smith was known to be a heavy drinker who had blacked out on several occasions in the past. Both Keysha Frye (Autumn's mother and Smith's girlfriend) and one of her neighbors testified that on the night of the incident and in the early morning hours the following day, Smith was "very drunk." Moreover, officers reported that they observed

Smith swaying back and forth while he was answering their questions shortly after they arrived at Frye's house. A reasonable juror could thus conclude from this evidence that Smith was too intoxicated to realize the fatal consequences of his actions.

In addition, there was no evidence to show that Smith had any motive to kill Autumn. Multiple witnesses, including Smith's sister and a former girlfriend with whom Smith had a child, testified that Smith had taken good care of children when he had been around them. Furthermore, Frye had on many occasions entrusted Smith to watch both Autumn and her two-year-old daughter, Ashley, while Frye was at work. The absence of any evidence as to why Smith would kill Autumn further calls into question the conclusion that he intended to kill her.

Smith also made no effort to conceal Autumn's body after she died. Instead, Smith took Autumn's body upstairs to the bedroom he shared with Frye, and he placed Autumn's body next to Frye in the bed. Smith also denied that Autumn was dead. A reasonable juror could interpret these actions as indicating that Smith did not realize that he had killed Autumn, a conclusion that, by necessary implication, would indicate a lack of intent to kill.

Finally, contrary to the Ohio Supreme Court's conclusion, Autumn's injuries are as consistent with Smith trying to keep her quiet as they are with any purported intent to take her life. Autumn suffered injuries to the side of her head and had bruising around her eyes. Dr. Marvin Platt, the coroner who performed the autopsy, testified at trial that Autum died from asphyxia and blunt trauma to the head. Injuries to her head and abrasions on her forehead, cheek, and chin, he surmised, indicated that Autumn was lying on her stomach and that her face had been forced into a pillow. He also observed that Autumn suffered subarachnoid and retinal hemorrhages consistent with shaken-baby syndrome, which indicated that an effort had been made to restrain Autumn. Although one interpretation of this testimony is that Smith deliberately suffocated Autumn in a pillow, another reasonable interpretation is that Smith unintentionally crushed Autumn with the weight of his body and caused her asphyxiation during the course of the rape.

The nature of Autumn's injuries thus do not necessitate a finding of deliberate intent to kill on the part of Smith.

I find particularly significant the fact that the jurors grappled with the issue of intent following the close of the evidence. During the penalty phase, the jury submitted the following question to the court: "If we feel [Smith] was not in his right mind, is that reason enough alone not to give him a death sentence according to the law"? This question indicates that the jurors, based on their weighing of the evidence presented at trial, had doubts as to whether Smith had the mental capacity to develop the intent to kill Autumn at the time of the rape.

The lead opinion declines to view the evidence from this perspective, asserting that the facts of Autumn's murder "conclusively proves intent to kill" so as to preclude any juror's reasonable doubt as to Smith's intent. (Lead Op. at 8) But the cases that the lead opinion relies upon to support that assertion all present scenarios markedly different from the circumstances in the instant case. In *Hopper v. Evans*, 456 U.S. 605, 613 (1982), for example, the petitioner admitted to shooting the victim in the back during the course of an armed robbery. The petitioner in *Campbell v. Coyle*, 260 F.3d 531, 535, 543 (6th Cir. 2001), stabbed his victim with a knife at least four times. Similarly, in *Slaughter v. Parker*, 450 F.3d 224, 237-38 (6th Cir. 2006), the petitioner bludgeoned the victim in the head and stabbed her five times in the chest, "including a stab wound that penetrated five inches into her chest and pierced her heart." (Citation omitted.) And in *Abdus-Samad v. Bell*, 420 F.3d 614, 629 (6th Cir. 2005), the petitioner shot the victim five or six times.

The above scenarios stand in sharp contrast to the circumstances of the present case, where there is no evidence conclusively demonstrating an intent to kill, such as repeated stabbings or shootings. There is in fact no indication that Smith used a weapon of any kind, unlike the petitioners in the cases relied upon by the lead opinion. In sum, I believe there is "some doubt," *see Beck*, 447 U.S. at 637, of Smith's intent to kill Autumn in light of his extreme intoxication, his lack of motive to kill Autumn, his taking Autumn's body to Frye after the incident, and the nature of Autumn's injuries.

Unfortunately for Smith, however, the above analysis is insufficient to grant Smith habeas relief because, as the lead opinion correctly notes, Ohio law at the time of his conviction effectively precluded Smith from relying on evidence of his intoxication to support the argument that he intended only to rape, and not kill, Autumn. *See State v. Otte*, 660 N.E.2d 711, 720 (Ohio 1996) (permitting a defendant to raise a voluntary-intoxication defense "only where the defendant was so intoxicated as to be mentally unable to intend anything" and thus "create a reasonable doubt as to his ability to form the specific intent essential to the charged felony." (citation and internal quotation marks omitted)). The facts before us demonstrate that Smith, despite his intoxication, clearly intended *something* of a criminal nature. (Indeed, Smith concedes on appeal that he intended to rape Autumn.) And, as noted by the lead opinion, the Supreme Court has upheld similar state-law interpretations against due process challenges. *See Montana v. Egelhoff*, 518 U.S. 37, 56 (1996) (holding that a Montana statute providing that voluntary intoxication could not be considered when determining a defendant's mental state did not violate due process); *see also Goodwin v. Johnson*, 132 F.3d 162, 191 (5th Cir. 1997) (holding that, in light of *Egelhoff*, "the laws of the state foreclose our finding a *Beck* violation on the basis that evidence of Goodwin's voluntary intoxication could have allowed a reasonable jury to convict him of the lesser-included offense of murder").

Without Smith's intoxication argument—the strongest, in my opinion, demonstrating his lack of intent to kill—the remaining evidence would not permit a reasonable juror to find that Smith intended only to rape Autumn. Therefore, despite my disagreement with the Ohio Supreme Court's analysis, I concur with the lead opinion's conclusion that Smith is not entitled to habeas relief.