OPINION
MERRITT, Circuit Judge.
This death penalty case from the Kentucky courts arises from the brutal murder of two victims in October of 1997. For reasons explained below, we conclude that a writ of habeas corpus must be issued as to the death sentence because the Kentucky trial court erroneously struck from the jury a Mr. Kovatch, an eligible juror who may have been in favor of sparing the Petitioner’s life. The state trial court, after a full examination of Mr. Kovatch at voir dire, found him not to be “problematic” as a juror but one who “could consider the entire range” of penalties. Then the next day the trial court excused him because the judge mistakenly remembered him saying he would not consider the death penalty. The issue is one of procedural fairness in administering the death penalty. As the Supreme Court has observed, to permit the for-cause exclusion of an otherwise-eligible juror “unnecessarily narrows the cross-section of venire *370 members” required under the Sixth Amendment and “ ‘stackfs] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law.’ ” Gray v. Mississippi, 481 U.S. 648, 658-59, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (quoting Witherspoon v. Illinois, 391 U.S. 510, 523, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)).
I. Factual and Procedural History
In 2001, a Kentucky state jury sentenced Roger Wheeler to death after convicting him of two counts of intentional murder.[1] On direct appeal, the Supreme Court of Kentucky affirmed Wheeler’s convictions and sentence, making the following findings of fact:
On October 2,1997, Louisville police discovered the bodies of [Nigel Malone and Nairobi Warfield] in the apartment the victims shared. The male victim was found in a hallway near the bathroom. He had suffered nine stab wounds. Two stab wounds to the chest were considered the fatal wounds by the medical examiner. She described the crime scene as having blood spatters on the floor, walls, furniture and appliances. The medical examiner believed that the main struggle occurred in the kitchen and progressed to the hallway where the body of the male victim was found.
The female victim died as a result of manual strangulation. The medical examiner testified that she believed the struggle between the female and her assailant occurred in the bedroom where she was found. The female victim had multiple abrasions on the left side of her neck and lacerations with a bruise on her mouth and several bruises on her lips. Her body was found in a seated position, leaning against a bedroom wall. She was covered with a blanket or quilt and a scissors was protruding from her neck. The medical testimony determined that she had been stabbed with the scissors after she was already dead. During the autopsy, the medical examiner discovered that the female victim was pregnant.
There was blood on the floors and walls in nearly every room in the apartment. Numerous blood samples were also collected at the scene and were subject to laboratory testing. No fingerprints were found on the scissors.
Wheeler denied killing the two victims but he changed his story on several occasions. Originally, he denied ever being inside of the apartment on the night the murders occurred but then later admitted being in the apartment on that night. He claimed that Nigel Malone was already stabbed, but that he did not see Nairobi Warfield. He also asserts that the assailant was already inside the apartment and he and that person fought which was why he was wounded.
Wheeler v. Commonwealth, 121 S.W.3d 173, 178 (Ky.2003) (Wheeler I). The Kentucky state courts subsequently denied Wheeler’s petition for post-conviction relief. See Wheeler v. Commonwealth, No. 2006-SC-000901-MR, 2008 WL 5051579, at *11 (Ky. Nov. 26, 2008) (Wheeler II).
Wheeler filed the instant petition for a writ of habeas corpus in May of 2009. Overruling Wheeler’s timely objections, the district court adopted the magistrate judge’s report and granted summary judgment to the State on all claims. We ultimately certified twelve claims for appellate review. Of these claims, six concern *371 Wheeler’s conviction; the rest deal with the jury’s imposition of the death penalty.
II. The Exclusion of Mr. Kovatch
The Kentucky trial judge struck Juror Kovatch from the jury even though he expressly stated that he could consider the full range of punishment—including the death penalty—after earlier expressing reservations and uncertainty about its wisdom. In reviewing his exclusion, the Supreme Court of Kentucky neither provided any details about Mr. Kovatch nor referred to Supreme Court case law on the subject. Instead, it simply stated that the trial judge “appropriately struck for cause those jurors that could not impose the death penalty.” Wheeler I, 121 S.W.3d at 179.
The Kentucky trial judge conducted the initial voir dire of Mr. Kovatch before the lawyers examined him. She inquired whether he could consider the entire range of penalties, specifically asking about “[twenty] years imprisonment” and “the death penalty.” Voir Dire Tr. at 1. He replied he “probably” could consider the death penalty “after some deep reflection.” Id. Mr. Kovatch further said that he had not “formed an opinion one way or the other” regarding the death penalty and noted that there were “arguments on both sides of ... it.” Id. at 2. Furthermore, he did not believe he had “any moral, religious, spiritual or personal beliefs that would keep [him] from considering the death penalty.” Id.
The prosecutor’s voir dire questioning explained that if the jury found the defendant guilty of two homicides, “the Judge, at that point, would give [the jury] a penalty range of [twenty] years all the way up to the death penalty and all the options in between.” Id. at 6. Mr. Kovatch replied that he had never “been confronted with that situation” before and it was “difficult for [him] to judge how [he] would ... act.” Id. The prosecutor then asked Mr. Ko-vatch if he was saying he was “not absolutely certain whether [he] could realistically consider [the death penalty].... ” Id. at 7 (emphasis added). Mr. Kovatch acknowledged he was not “absolutely certain” by saying, “I think, I think that would be the most accurate way I could answer your question.” Id.
Soon after, upon examination by defense counsel, Mr. Kovatch described the death penalty as “a very philosophical topic” and “a very difficult one.” Id. at 8. He discussed getting older, understanding “a lot more things about values and [ ] life itself.” Id. He described himself as “a bit more contemplative on the issue of taking a life and ... whether or not we have the right to take that life.” Id. He was then asked whether he felt he could “consider all of the options presented.” Id. at 9. He responded, “I believe I can, sir.” Id.
After the trial judge excused the jurors for the evening, the prosecution moved to excuse Mr. Kovatch for cause, claiming he gave “two inconsistent answers” because “he could not say whether he could realistically consider the death penalty or not.” Id. at 9. The prosecutor suggested that the “gravamen of his testimony” provided grounds to strike him for cause under Gall v. Parker, 231 F.3d 265 (6th Cir.2000), as “a juror who can’t say if he can give the death penalty.” Voir Dire Tr. at 9-10.
Responding to the prosecution’s motion, defense counsel highlighted Mr. Kovatch’s answers to the judge indicating his ability to consider “all the penalty options.” Counsel said he was “a man who has contemplated this issue” who “wants to be ... very honest and candid with the Court” despite having “some reservations about the death penalty.” Id. The defense further argued (correctly) that nothing in the case law disqualifies a juror “because they *372 ... question some aspects of the death penalty or they consider it to be a serious matter, or they consider it to be something that ... calls into questionf ] ... issues of ... life and how important it is.” Id.
Responding immediately to the prosecutor’s motion, the trial judge expressed her impression that Mr. Kovatch was “someone who would take this job very seriously and who had serious reservations about the death penalty.” Id. at 12. She believed he was someone who “could consider the entire range” after her questioning and “didn’t even see him as problematic when [she] got through with him.” Id. The trial judge then took the motion under advisement.
The following morning, the trial judge struck Mr. Kovatch for cause, relying on an inaccurate paraphrase of the record suggesting that Mr. Kovatch “couldn’t consider” the death penalty:
[T]he Commonwealth moved to strike Mr. Kovatch because ... of his expressed ... concerns about considering the entire range. And when I went back and reviewed his entire testimony, [the prosecutor] concluded with saying, “Would it be accurate to say that you couldn’t, couldn’t consider the entire range ?” And his response is—I think was, “I think that would be pretty accurate.” So I’m going to sustain that one too.
Id. at 14 (emphasis added). This description differed materially from the prosecutor’s actual question: “And if I understand you correctly, you’re ... telling me that, at this point you’re not absolutely certain whether you could realistically consider it or not? ” Id. at 7 (emphasis added).
Mr. Kovatch agreed he did not know to an absolute certainty whether he could realistically consider the death penalty, but the court proceeded as if he knew he could not. Mr. Kovatch clearly stated he could consider the full range of penalties prescribed by Kentucky law, and before her subsequent mischaracterization of his answer, the trial judge observed that he could “consider the entire range” and should be viewed as a good juror who was not even “problematic.”
Although Supreme Court precedent addressing the exclusion of venirepersons from death-penalty juries has evolved and been clarified, the Court has repeatedly held that a venireperson who has reservations about the death penalty cannot be excused for cause if he or she is able to follow the trial court’s instructions and consider all penalties provided under the law. In Witherspoon, the first Supreme Court case in a line of cases addressing this issue, the Court held that the only venirepersons who may be excluded for cause are:
[T]hose who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that then-attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt.
891 U.S. at 522 n. 21, 88 S.Ct. 1770. In Wainwright v. Witt, the Court clarified Witherspoon as follows:
That standard is whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” We note that, in addition to dispensing with Wither-spoon’s reference to “automatic” deci-sionmaking, this standard likewise does not require that a juror’s bias be proved with “unmistakable clarity.” This is because determinations of juror bias cannot be reduced to question-and-answer *373 sessions which obtain results in the manner of a catechism.
469 U.S. 412, 424, 105 S.Ct. 844, 88 L.Ed.2d 841 (1985) (footnote omitted).
In subsequent cases, the Court again clarified its position by holding that a juror may not be excluded if, like Mr. Kovatch, he can set aside his doubts and consider the death penalty. In Lockhart v. McCree, Justice Rehnquist explained:
It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.
476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). And, in Uttecht v. Brown, the most recent Supreme Court decision to discuss the for-cause removal of death penalty sentencing-phase juror, the Court again reiterated that “[cjapital defendants have the right to be sentenced by an impartial jury,” and, to this end, reaffirmed that “[t]he State may not infringe [the Witt right] by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.” 551 U.S. 1, 9, 22, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007).
Although Uttecht held that a trial judge’s decision regarding for-cause removals should be afforded great deference, id. at 17-22, 127 S.Ct. 2218, it also made clear that “[t]he need to defer to the trial court’s ability to perceive jurors’ demeanor does not foreclose the possibility that a reviewing court may reverse the trial court’s decisions where the record discloses no basis for a finding of substantial impairment,” id. at 20, 127 S.Ct. 2218. In Uttecht, the deference owed to the trial judge was largely premised on the trial judge’s ability to “observe the demeanor of [the juror during voir dire ],” and the defense’s decision not to object when, after voir dire had concluded, the State challenged the juror for cause. Id. at 17-19, 127 S.Ct. 2218 (“The defense’s volunteered comment that there was no objection is especially significant....”). Moreover, it was clear from the record that the juror “had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case.” Id. at 13, 127 S.Ct. 2218.
Here, Mr. Kovatch did not display a misunderstanding of his role as a potential juror or misstate the applicable law. He understood the decisions he would face and engaged with them in a thoughtful, honest, and conscientious manner. More impor-' tant in the context of Uttecht, the trial judge’s initial assessment of Mr. Kovatch’s answers and demeanor reveals that she judged him as someone who “could consider the entire range” and “didn’t even see him as problematic when [she] got through with him.”[2] The trial judge reversed her *374 initial assessment of Mr. Kovatch’s qualification, which was based on his demeanor and answers, after misapprehending a single question and answer exchange with the prosecutor. Had the trial judge properly processed that exchange, her initial belief that Mr. Kovatch was not “problematic” and “could consider the entire range” would have been confirmed. Thus, the deference owed to the trial judge’s ability to assess Mr. Kovatch’s demeanor supports that he was Witt—qualified to serve on Wheeler’s jury.
Aware of the great deference owed a trial judge’s decision to remove a potential juror for cause, we nevertheless find that the Kentucky court unreasonably applied clearly established Supreme Court law— namely, Witt and its progeny—when it held that Mr. Kovatch’s removal for cause was constitutional.[3]
The Supreme Court has repeatedly made clear that the improper exclusion of a qualified juror in a death penalty case is presumed prejudicial. In Gray, it stated that it had “established a per se rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under Witherspoon is eligible to serve, has been erroneously excluded for cause.” Gray, 481 U.S. at 659, 107 S.Ct. 2045 (citing Davis v. Georgia, 429 U.S. 122, 123-24, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976)). Thus, an improper for-cause exclusion of a prospective juror such as Mr. Kovatch is precisely the type of “structural error”[4] that the Supreme Court has said may not be excused through harmless-error analysis or on grounds of a lack of prejudice.
Since the Lockhart and Gray cases in 1986 and 1987, this has been the constitutional rule we must apply in all for-cause juror-exclusion cases. See, e.g., Uttecht, 551 U.S. at 22, 127 S.Ct. 2218 (“The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.”). The specificity and clarity of this rule also satisfies the AEDPA statutory requirement that a writ of habeas corpus may not be issued against a state-court judgment unless the state decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).[5]
*375 Because we find that the trial court unconstitutionally excluded Mr. Kovatch from the jury warranting a new penalty-phase trial for Wheeler, we need not decide and therefore pretermit any other sentencing issues raised in his habeas petition. We will now turn to the issues raised by Wheeler concerning the guilt phase of his trial. We do not find that any of them warrant habeas relief.
III. Evidence of Victim’s Pregnancy
Wheeler contends that the trial court denied him a fundamentally fair trial by admitting “irrelevant” evidence that the female victim, Nairobi Warfield, was pregnant at the time of her death. In the state appellate courts, Wheeler framed this issue primarily as a violation of Kentucky state law[6] as well as the Fourteenth Amendment of the United States Constitution. In this habeas appeal, he asserts that the allegedly improper admission of the evidence was so prejudicial as to render his entire trial fundamentally unfair.
There were only two references to War-field’s pregnancy at trial.[7] The Supreme Court of Kentucky held that this evidence was admissible and not prejudicial under Kentucky law, particularly in light of the “brief’ role it played. Wheeler I, 121 5.W.3d at 181. Thus, this claim is not cognizable on federal habeas corpus review—at least to the extent that Wheeler claims its admission contravened Kentucky’s laws or its rules of evidence. See, e.g., Bey v. Bagley, 500 F.3d 514, 519 (6th Cir.2007) (“[EJrrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus.”).
Wheeler cites no Supreme Court decisions in which several brief references to the pregnancy of the murder victim, without more, have been held sufficiently egregious so as to violate the due process clause.[8] It stands to reason that a state court cannot rule contrary to established precedent when no such precedent exists. In short, Wheeler has failed to persuade us that the admission of evidence related to Warfield’s pregnancy rendered his trial fundamentally unfair. Accordingly, no ha-beas relief is appropriate on this claim.
IV. Ineffective-Assistance-of-Counsel Claims
To demonstrate ineffective assistance of counsel, Wheeler must demonstrate that his trial “counsel’s performance was deficient, and that the deficiency prejudiced his defense.” Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Moreover, “[w]hen § 2254(d) applies, the question is not whether counsel’s actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *376 Strickland’s deferential standard.” Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).
Wheeler raises three guilt-phase ineffective-assistance-of-counsel claims. We address each in turn.

A. Failure to Conduct an Adequate Investigation of Wheeler’s Shoes

Police found several bloody shoe prints at the crime scene. In the middle of trial, Wheeler informed his trial counsel that he still possessed the gray Nike tennis shoes he claimed to have worn when he entered the victims’ apartment on the night of the murders. Wheeler’s trial counsel thus attempted to introduce these shoes for the jury to compare with the bloody shoe-prints. The trial court, however, sustained the prosecution’s objection and excluded the shoes on grounds of inadequate notice and lack of a chain of custody. The Supreme Court of Kentucky held that their exclusion was proper for a different reason: the shoes were irrelevant because Wheeler never testified that he was wearing them while he was inside the victims’ apartment on the night of the murders. Rather, Wheeler testified on avowal only that he was wearing them the next day when he was arrested. Nor did the defense offer any other evidence to link the shoes to the crime scene. Thus, “[t]he mere fact that Wheeler owned a pair of shoes that may or may not have matched the shoe prints found at the crime scene did not tend to make the defense theory more probable.” Wheeler I, 121 S.W.3d at 182.
In this habeas appeal, Wheeler argues that his trial counsel was ineffective for: (1) failing to elicit testimony that his shoe size was larger than the prints found by police; (2) failing to lay a proper foundation for introducing the tennis shoes he claims he was wearing the night of the murders; and (3) failing to retain a shoe-print expert.
As an initial matter, Wheeler’s claim that his trial counsel should have elicited testimony from him about his shoe size is procedurally defaulted. Wheeler did not present this claim to the state courts, and no state remedy now exists for doing so. See Lovins v. Parker, 712 F.3d 283, 293 (6th Cir.2013). Nor does Wheeler attempt to show cause and prejudice to cure the default. Accordingly, no relief is warranted.
Wheeler also faults his trial counsel for failing to elicit testimony as to whether he wore his tennis shoes on the night of the murders. The thrust of this argument is that admission of the tennis shoes would have corroborated Wheeler’s testimony and thus enhanced his credibility—ie., someone else must have committed the murders if the bloody footprints were not his. This line of reasoning omits a critical point: Wheeler cannot demonstrate prejudice without knowing the victims’ shoe sizes. The bloody footprint may have belonged to one of them.
As for his claim regarding his trial counsel’s failure to call a shoe expert, Wheeler asserted in his state post-conviction proceedings that had his tennis shoes been admitted into evidence, an expert would have been unnecessary for “jurors to compare the shoes with the shoe prints at the scene. A layperson could determine this fact.” Wheeler II, 2008 WL 5051579, at *6. The Supreme Court of Kentucky considered this admission “tantamount to a concession that lack of an expert was not ineffective assistance.” Id. We agree. In light of these facts and the strength of the murder evidence, we cannot say that the Supreme Court of Kentucky unreasonably applied Strickland by holding that Wheel *377 er was not prejudiced by the lack of a shoe expert.

B. Other Ineffective-Assistance-of-Counsel Claims

Wheeler claims that his trial counsel was constitutionally ineffective for failing to explain the presence of his blood on the female victim’s thigh. He further argues that his trial counsel was ineffective for not sufficiently investigating or challenging the adequacy of the police techniques used to gather the blood evidence at the crime scene. The answer to these arguments is that there was simply no evidence his lawyer could use to rebut this evidence of guilt. Wheeler’s brief cites neither any authority nor any portion of the record in support of this claim. Hence, this claim must be rejected.
Wheeler further contends that his trial counsel was ineffective for failing to call Earl Ricketts, Jr., to contradict the testimony of Denise Mumpfort. Mumpfort worked at a convenience store near the apartment where the murders occurred and testified that Wheeler had entered the store that night looking like someone had “poured [blood] on his head.” Wheeler claims that Ricketts, a security guard at the store, would have testified that Wheeler only had some blood on him “but not a lot.” This proposed testimony would not have contradicted Mumpfort’s in any material way. The mere presence of blood is all that mattered given Wheeler’s testimony that he had been injured while fighting the alleged assailant who was armed with a knife. Trial counsel’s decision not to call Ricketts was thus a question of tactics, and was not a significant mistake, if a mistake at all.
V. Prosecutorial Misconduct
Wheeler’s first claim of misconduct involves the prosecutor’s references to the shoeprint argument as a “defense trick” designed to distract the jury from more critical evidence.[9] The Kentucky trial court held that these statements were fair commentary on the defense’s theory of the case—ie., Wheeler’s reliance upon supposed inconsistencies with various shoeprints. The Kentucky Supreme Court held that the prosecutor’s comments did not deprive Wheeler of a fundamentally fair trial. Wheeler I, 121 S.W.3d at 189. Although the word “trick” can be viewed as unnecessarily pejorative, the comment was both isolated and responsive, and the Kentucky Supreme Court reasonably concluded that the comment did not have an effect on Wheeler’s due process right to a fair trial.
Wheeler also condemns the prosecutor’s comments in closing concerning the unavailability of WTieeler’s tennis shoes— evidence the prosecution itself had successfully convinced the trial court to exclude. Specifically, the prosecutor stated, “We need a shoe to compare [the bloody shoeprint] to. We don’t have that. If you remember, [Wheeler] says, T had ... gray Nike tennis shoes, denim pants and a black or dark sweatshirt on.’ He knows where his clothes are at. Mr. Cooperative never brought them in.”[10] Wheeler ar *378 gu.es that this statement amounts to an improper attempt to shift the burden of proof onto him—ie., he needed to produce his tennis shoes in order to establish his innocence. The Kentucky trial court held that by previously mentioning the shoe-print evidence, Wheeler’s trial counsel opened the door for the prosecution to discuss that topic. The Kentucky Supreme Court held that the argument did not render Wheeler’s trial fundamentally unfair. Wheeler I, 121 S.W.3d at 189. This conclusion did not involve an unreasonable application of federal law.
Wheeler’s final misconduct argument concerns the prosecutor’s statements regarding Shannon Calloway, a witness who discovered the victims’ bodies and later accused Wheeler of being the perpetrator. Unbeknownst to the jury, Calloway died before trial in an unrelated incident. In final arguments, however, the defense suggested that Calloway may have been the real murderer but never explained that he was dead. In response, the prosecutor’s closing argument stated that it was “kind of difficult in the middle of trial to ' stand up and run out and find people that the Defense wants' us to get up and start pointing fingers at.” Wheeler contends that this argument was improper for suggesting that he had some duty to call Calloway or had something to hide by failing to call Calloway as a witness. Again, the Kentucky Supreme Court determined that the argument did not deprive Wheeler of a fundamentally fair trial, and this determination, too, was not unreasonable. It is clear from the record that the prosecutor’s comments were made in response to Wheeler’s trial counsel’s intimations that Calloway was the real murderer.
VI. Requested Jury Instructions
Finally, Wheeler argues that the trial court’s failure to instruct the jury on voluntary intoxication and extreme-emotional disturbance denied him a fundamentally *379 fair trial and thus was contrary to, or an unreasonable application of, the Supreme Court’s holding in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
In capital cases, Beck requires a jury be instructed on non-capital lesser-included offenses only if “the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater.” Id. at 635, 100 S.Ct. 2382. Moreover, “due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction.” Hopper v. Evans, 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Thus, we must consider the facts of the case and the criminal laws of the state to determine whether the requested instruction on a lesser-included offense is warranted. See Smith v. Bradshaw, 591 F.3d 517, 523-25 (6th Cir.2010).
To receive extreme-emotional-disturbance instructions under Kentucky law, a defendant must put forth evidence of a dramatic “triggering event” that created “temporary emotional disturbance that overwhelm[ed] the defendant’s judgment.” Baze v. Parker, 371 F.3d 310, 325 (6th Cir.2004) (citations omitted). Wheeler, however, has made no such showing. Neither his testimony nor any circumstantial evidence suggested any possible triggering event that would cause a mindless explosion of brutal violence. The Supreme Court of Kentucky thus reasonably found that Wheeler was not entitled to an extreme-emotional-disturbance instruction.
The same is true concerning the voluntary-intoxication instruction. Under Kentucky law, this instruction is warranted only where the evidence sufficiently indicates a voluntary intoxication so severe that the defendant not only could not form the intent to kill, but also did not know what he or she was doing at the time. Harris v. Commonwealth, 313 S.W.3d 40, 50-51 (Ky.2010) (citation omitted). Although Wheeler had undoubtedly been drinking and smoking crack cocaine the night of the murders, the record presents no evidence suggesting that he was so intoxicated that he could not conform his conduct to the law. Indeed, Wheeler’s testimony as to his actions later that evening confirmed that he was well aware of events around him and acting of his own volition. Again, the Supreme Court of Kentucky reasonably reached this exact conclusion in accordance with the Beck standard.
VII. Conclusion
For the foregoing reasons, we hold that Wheeler is entitled to habeas relief as to his death sentence only. The judgment of the District Court is affirmed as to the guilt phase of the state trial. Contrary to our dissenting colleague’s view, however, AEDPA does not protect an inconsistent ruling by the state trial judge based on a mistaken memory of a juror’s earlier voir dire testimony. The judgment, therefore, is reversed as to the death sentence, and the case is remanded with instructions to issue the writ of habeas corpus.

. The jury recommended a death sentence for each conviction after finding one aggravating circumstance: Wheeler’s acts of killing were intentional and resulted in multiple deaths. See Ky.Rev.Stat. Ann. § 532.025(2)(a)(6).

. In responding to the State’s challenge, the trial judge said:
Well, um, my overall sense was that he was, uh, someone who would take this job very seriously and who had serious reservations about the death penalty, but his responses to my questions were not at all indicative of someone—uh, in fact, what I do when I finish my, my questioning is, is, first of all, put down "could consider entire range” or "exhibits reluctance on death penalty” or "exhibits reluctance on 20 years” or "can’t consider”—I do sort of a summary. Uh, and I put "could consider entire range.” I mean, I didn’t even see him as problematic when I got through with him. Um, I think if you look at the totality of the questioning, what he’s indicating, uh, that I understood *374 was that he would take it very seriously but that he could consider the entire range. Um, and I guess and, and maybe I just didn’t hear it phrased the, the way that [the prosecution] phased it but, um, I didn’t hear him say that he couldn’t realistically consider the death penalty. Did he actually say that?
R. 74, PID 892-93.

.We also observe that the trial judge's misapprehension of Mr. Kovatch’s exchange with the prosecutor may itself warrant relief under 28 U.S.C. § 2254(d)(2) because it led to a “a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” We need not reach that question.

. For a discussion of the "structural error” cases, including the Gray case, see 3B Charles Alan Wright et al., Federal Practice and Procedure § 855 (4th ed.2014).

. AEDPA deference prevents federal habeas courts from upsetting many state court determinations. Under AEDPA, we may not grant a writ of habeas corpus unless the state court’s adjudication of the claim was contrary to or an unreasonable application of federal law or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). An unreasonable application of clearly established federal law occurs where a state court accurately identifies the governing legal rule *375 but applies it in an unreasonable manner to the facts of the case before it. Moore v. Berghuis, 700 F.3d 882, 886 (6th Cir.2012).

. Wheeler argued that the admission of this evidence violated Kentucky Rule of Evidence 404(b) as well as Sections 2 and 11 of the Kentucky Constitution—which provide for a right to a fair trial.

. The medical examiner testified the autopsy revealed that Warfield was pregnant with a small embryo, and the prosecution also briefly mentioned the pregnancy during its closing argument. (R. 52, PID # 57).

. Wheeler's brief relies heavily on the Fifth Circuit’s opinion in White v. Thaler, 610 F.3d 890 (5th Cir.2010). This case does not entitle him to habeas relief. Even if we were to conclude that the Supreme Court of Kentucky’s decision in this case was "contrary to” White, that case is not Supreme Court precedent as required by 28 U.S.C. § 2254(d)(1).

. The prosecutor said: “So [the defense] gets up and said, 'Well, the shoeprint, that’s the most telling of all.’ Forget about all that DNA, forget about all the lies. It's called the defense trick. Look away, look away, look away. Don't look at the facts.’’ PID 2053.

. During closing argument, Wheeler's counsel focused on the shoeprint evidence several times, arguing: "Now when you go back to deliberate, I’m going to ask you to look very, very closely at the shoeprint evidence.... Please look very, very closely when you get back there. This shoeprint [lifted from the crime scene] and these shoeprints [lifted from *378 a different area of the crime scene] don't match. There were obviously at least two other people in that home.” PID 2014-42. Later, she suggested that a witness who was not called left the shoeprints: “Maybe they should have checked Shannon Calloway’s shoe size. Maybe they should have compared Shannon Calloway’s shoes to what they’ve got here.” PID 2046. Again, "There had to be more than one person [in the home]. The shoeprint evidence tells you that.” PID 2047. All of this appears to be support for the defense’s ultimate conclusion that: “Now if these shoepnnts would have fit those of Roger Wheeler’s, you would have heard that evidence. Those aren 't Roger Wheeler’s shoeprints." PID 2048.
Aware that the defense’s closing argument revolved around the shoeprint evidence (or lack thereof), the prosecutor responded: “ETU [the state’s evidentiary unit] does a good, thorough job [lifting the shoeprints]____ But you know what? We need a shoe to compare it to. We don’t have that. If you remember, [Wheeler] says, 'I had gray Nike Airs or gray Nike tennis shoes, denim pants, and a black or dark sweatshirt on.’ He knows where his clothes are at. Mr. Cooperative never brought [the shoes] in.” PID 2051-52.
The trial judge overruled the defense’s objection to this statement. Out of the presence of the jury, the trial judge first commented that the defense had tried to introduce the shoes only after trial had started (and thus the evidence was untimely). The trial judge then stated: "I do think it’s fair for [the prosecutor] to comment on the fact that [the defense] focused greatly on the shoeprint [evidence] ... where that could have been pursued and it wasn't.” PID 5052-53.
Regarding use of "Mr. Cooperative,” the prosecutor made clear that "[the defense attorneys] keep hammering on how cooperative [Wheeler] was [when approached by police prior to being arrested], and that’s why I'm making the statement if he was so cooperative, then why didn't he bring [the shoes] in, too?” PID 2053. The trial judge responded that she understood the prosecutor’s reasoning and did not suggest it was improper.